**BOSTON SCIENTIFIC CORP., Plaintiff, Defendant–in–Counterclaim,**

v.

**SCHNEIDER (EUROPE) AG, and Schneider (USA) Inc., Defendants and Counterclaimants,**

v.

**SCIMED LIFE SYSTEMS, INC., Defendant–in–Counterclaim.**

**BOSTON SCIENTIFIC CORP. and Scimed Life Systems, Inc., Plaintiffs,**

v.

**ADVANCED CARDIOVASCULAR SYSTEMS, INC., and Schneider (Europe) AG, and Schneider (USA), Inc. Defendants.**

CIV. A. Nos. 94–10967–DPW, 95–12715–DPW.

United States District Court, D. Massachusetts.

Oct. 23, 1997.

Robert E. Hillman, Heidi E. Harvey, John M. Skenyon, Fish & Richardson, Boston, MA, for Boston Scientific Corp..

John E. Kidd, Louis Greco, Donald L. Rhoads, Rogers & Wells, New York City, Michael B. Bogdanow, Cynthia J. Cohen, Meehan, Boyle & Cohen, PC, Boston, MA, Timothy C. Blank, Dechert, Price & Rhoades, Boston, MA, Joseph A. Tate, Judy L. Leone, Martin J. Black, Dechert Price & Rhoades, Philadelphia, PA, for Schneider (USA) AG.

Robert E. Hillman, Heidi E. Harvey, Kurt L. Glitzenstein, Fish & Richardson, Boston, MA, for SciMed Life Systems, Inc.

Paul F. Ware, Goodwin, Proctor & Hoar, Boston, MA, for Advanced Cardiovascular Systems, Inc.

Bryan Baumeister, Roger & Wells, New York City.

Leora Ben–Ami, Annette M. McGarry, John E. Kidd, Roger & Wells, New York City.

## MEMORANDUM AND ORDERS

WOODLOCK, District Judge.

### I.

These two cases present images from the kaleidoscopic reconfigurations of products, affiliations and litigation undertaken during the past decade by four competitors in the market for medical devices designed to treat clogged coronary arteries.

The first case before me (Civil Action No. 94–10967–DPW) was initiated by Competitor A to establish that its products do not infringe the patent controlled by Competitor B or alternatively that the patent is invalid. Competitor B has counterclaimed alleging infringement.

During the course of this litigation, Competitor A merged with Competitor C. Competitor C in earlier litigation had unsuccessfully challenged the validity of Competitor B's patent. After the merger, Competitor A

and Competitor C centralized the medical device business at issue here in Competitor C. The pleadings before me have been amended to permit Competitor B to allege infringement by Competitor C. The pleadings were also amended to permit Competitor A to allege inequitable conduct by Competitor B in the acquisition of the patent, an allegation which Competitor A's new affiliate, Competitor C, had also unsuccessfully pressed in its earlier litigation with Competitor B.

The second case before me (Civil Action No. 95–12715–DPW) was initiated by Competitors A and C to attack Competitor B's patent by alleging an antitrust violation arising out of a cross licensing agreement between Competitor B and Competitor D. Competitor D is yet another active participant in this medical device market with whom Competitors A, B and C have variously been engaged in litigation over the past decade.

The parties have filed six dispositive motions raising a classic question of patent infringement but also raising questions of first impression concerning the preclusive effect of prior litigation and the fundamental question of the proper interplay between patents and antitrust law.

## II. *The Pending Motions*

Competitor A, plaintiff Boston Scientific Corporation ("BSC")[1] filed Civil Action No. 94–10967 (the "patent action") on May 13, 1994, against Competitor B, Schneider (Europe) AG and Schneider (USA) Inc. (collectively "Schneider")[2] seeking a declaratory judgment of noninfringement and invalidity as to United States Patent No. 4,762,129 (the "'129 patent"). BSC now moves for summary judgment on the issue of non-infringement.

In turn, Schneider moves 1) for partial summary judgment that BSC not be allowed to litigate the issue of validity; 2) for partial summary judgment that BSC not be allowed to litigate the issue of inequitable conduct;[3] and 3) for partial summary judgment dismissing the second affirmative defense of unenforceability, filed by Competitor C, BSC's wholly owned subsidiary SciMed Life System, Inc. ("SciMed").[4] Schneider argues

1. Plaintiff BSC is a corporation organized and existing under the laws of Delaware, having an office and principal place of business in Natick, Massachusetts.

2. Defendant Schneider (Europe) AG is a corporation organized and existing under the laws of Switzerland, having an office and principal place of business in Bulach, Switzerland.

   Defendant Schneider (USA) Inc. is a corporation organized and existing under the laws of Minnesota, having an office and principal place of business in Plymouth, Minnesota. *See Schneider (Europe) AG v. SciMed Life Sys., Inc.,* No. 3–91 CIV 241, 1993 WL 463204, at *3–4 (D.Minn. May 14, 1993) (Alsop, J.) (setting forth relationship and rights between Schneider (Europe) and Schneider (USA) under a license agreement).

3. Pursuant to a January 24, 1996 order by Magistrate Judge Alexander, BSC has been allowed to amend its complaint to add inequitable conduct as an additional allegation against the patent's purported validity.

4. Schneider—also pursuant to the January 24, 1996 order—has amended its answer to assert a counterclaim against SciMed, thereby adding SciMed as a party. BSC and SciMed signed a merger agreement on November 8, 1994, and as a result SciMed is now a wholly owned subsidiary of BSC. While this counterclaim similarly seeks to enjoin SciMed from further alleged infringement of the '129 patent, Magistrate Judge Alexander cautioned that the addition of SciMed as a party would be limited to SYNERGY catheters. Magistrate Judge Alexander explained:

   > The "SYNERGY Catheters already at issue" refer to any catheters previously deemed within the SYNERGY catheter product line due to their injection into this claim regardless of their actual, specific names. Defendant's motion refers to the SYNERGY catheter as the SYNERGY, SYNERGY II, SYNERGY III, OUTSIDER, ENERGY and HIGH ENERGY. The Court notes that if the OUTSIDER, ENERGY, or HIGH ENERGY catheters mentioned in defendant's renewed motion do not fall within the realm of the "SYNERGY catheter already at issue" because they were not previously considered part of this dispute, then addition of SciMed as to those catheters is not allowed.

   *Boston Scientific Corp. v. Schneider (Europe) AG,* Civ. No. 94–10967–DPW, slip op. at 8 n. 5 (D.Mass. Jan. 24, 1996) (order on various discovery motions and motions to amend).

   SciMed asserts as an affirmative defense to the counterclaim that the Bonzel patent "is unenforceable ... for misuse of the patent in its enforcement and in violation of the patent and antitrust laws." This affirmative defense was interposed the same day that BSC and SciMed served their oppositions to the motions to dismiss in the second action before me, *Boston Scientific Corp. v. Advanced Cardiovascular Sys., Inc.,* Civ. No. 95–12714–DPW.

that these three partial summary judgment issues were conclusively determined before Judge Alsop in the United States District Court for the District of Minnesota in *Schneider (Europe) AG v. SciMed Life Systems, Inc.*, 852 F.Supp. 813 (D.Minn.1994), *aff'd*, 60 F.3d 839 (Fed.Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 520, 133 L.Ed.2d 427 (1995) ("the *SciMed* action").

In Civil Action No. 95–12715 (the "antitrust action") BSC and SciMed together bring an antitrust action against Schneider and Competitor D, Advanced Cardiovascular Systems, Inc. ("ACS").[5] BSC and SciMed argue that Schneider and ACS have wrongfully obtained patents and have since used these patents to dominate the rapid exchange catheter market in the United States.

Specifically, BSC and SciMed assert that Schneider and ACS—through alleged inequitable conduct before the patent office and in other litigation, and by using a cross-licensing settlement agreement between Schneider and ACS for Schneider's Bonzel patent and ACS's series of Yock patents—have a) monopolized trade, conspired to monopolize trade, and attempted to monopolize trade in violation of Section 2 of the Sherman Act and applicable state antitrust laws (Counts 1–3); b) conspired to restrain trade in violation of Section 1 of the Sherman Act and applicable state antitrust laws (Count 4); c) violated unfair competition laws under Mass. Gen. L. ch. 93A (Count 5); and d) violated state abuse of process laws (Count 6). Before me are motions to dismiss by Schneider and ACS pursuant to Fed.R.Civ.P. 12(b)(6).

I note that in the antitrust action BSC and SciMed raise essentially the same issues (with the same supporting facts) as they have in the patent action with regard to the invalidity of the Bonzel patent due to Schneider's alleged inequitable conduct before the PTO and in the *SciMed* action.

5. Plaintiff and defendant-in-counterclaim SciMed is a corporation organized and existing under the laws of Minnesota, having an office and principal place of business in Maple Grove, Minnesota.

5. Defendant ACS is a corporation organized and existing under the laws of California, having an office and principal place of business in Santa Clara, California.

## III. *Background*

### A. *The Invention*

The '129 (or "Bonzel") patent, entitled "Dilatation Catheter" (also known as a "balloon dilatation catheter" or, more commonly, a "rapid exchange catheter") was issued on August 9, 1988 and names Tassilo Bonzel as the inventor. The patent was amended by U.S. Reexamination Certificate B1 4,762,129 issued on July 2, 1991, pursuant to 35 U.S.C. § 304.[6] Schneider (Europe) is the exclusive licensee, and Schneider (USA) is a sub-licensee.

In general, the catheters at issue in this case are used to treat coronary arteries that are clogged with fatty deposits ("lesions") in areas known as "stenoses." Such deposits obstruct the coronary arteries and can cause angina or a heart attack if blood flow is blocked. A procedure known as angioplasty utilizes a balloon dilatation catheter to open clogged arteries and improve blood flow. A Percutaneous Transluminal Coronary Angioplasty ("PTCA") is a special angioplasty procedure that is a less invasive alternative to coronary artery bypass surgery, and is performed by specialists known as "interventional cardiologists."[7]

First, a wide-diameter guiding catheter is inserted into the femoral artery in the patient's groin area and threaded through the blood vessels to the "ostium," or opening, of the coronary arteries. Next, a smaller diameter balloon dilatation catheter (a long, thin, plastic tube with an expandable balloon positioned on the tip) is inserted inside the larger catheter. This balloon catheter, complete with guide wire, which the doctor manipulates outside the patient's body, is also threaded to the point of the ostium. The distal tip (i.e., the end that is farthest away from the physician) of the guide wire is

6. For convenience, I will refer to the '129 patent and the '129 reexamination certificate collectively as the "Bonzel patent."

7. For an extended discussion on the history of PTCA, see *SciMed*, 852 F.Supp. at 824–26.

pushed beyond the stenosis. The balloon catheter is pushed forward along the guide wire until the balloon is beside (or inside) the stenosis. The balloon is then inflated to crack the stenosis and widen the artery walls, thereby restoring blood flow.

Balloon catheters for dilatation of human coronary arteries (and the PTCA procedure) were first introduced in 1977. However, since that time many different designs have been developed. The first design or "prior art," known as the "over-the-wire" catheter, utilizes two tubes (or "lumens") of the same length leading to the balloon—one covering the wire, and one for inflation.[8] As of November 1984 the prevalent view among the majority of cardiologists was that it was necessary for an over-the-wire catheter to have a full-length guide wire lumen to assist, for example, in measuring blood pressure and withdrawing the balloon catheter. *See SciMed*, 852 F.Supp. at 826.

However, a problem with this design emerged whenever a physician needed to remove a balloon catheter mid-way through the procedure and insert a new one (because, for example, the balloon was too small or too large). Obviously, it was not desirable to remove the entire contraption (catheter *and* guide wire) from a patient's body, due to the risk and time involved in re-threading. It was preferable to leave the guide wire in place, remove the balloon catheter, and thread a new catheter over the existing guide wire. However, this procedure required the wire to be double the length of the catheter, so that as the physician slid the catheter back out over the wire, there would be enough wire outside the body to receive the catheter as it was withdrawn and still leave bare wire for a physician to hold.[9] This complicated procedure usually required two physicians.

The Bonzel invention resolves this problem by using a *short* guide wire tube instead of a full-length guide wire tube. Both tubes are

still employed beginning at the balloon (the distal end), but the guide wire tube terminates shortly thereafter. As a result, the guide wire exits from this short shaft instead of exiting at the end of the full length of the catheter. This change allows *one* physician to slide the catheter off the wire and easily insert another while still gripping the wire—hence its designation as a "rapid exchange catheter." Moreover, less wire is required because the length of wire outside the body only needs to accommodate the length of the shortened guide wire tube. *See also SciMed*, 852 F.Supp. at 827 (discussing other advantages).

BSC's SYNERGY family of catheters, to be discussed in more detail below, utilizes a full length guide wire tube, but also incorporates rapid exchange capabilities by creating an exit hole in the guide wire tube. They are sometimes referred to as "convertible" rapid exchange catheters.

Rapid exchange catheters occupy a distinct market segment and are interchangeably known as "rapid exchange," "monorail," and "monorail-type." It should be noted that "Monorail" is also the trade name of the original Schneider rapid exchange catheter.

### B. Relevant Relational History of the Parties

An understanding of the relationships and litigation history among the parties in these two actions is necessary as a foundation for analyzing the preclusion arguments before me.

1. *Schneider v. ACS*, No. C–88–20742–WAI (N.D.Cal.) and *ACS v. Schneider*, No. C–91–20507–WAI (N.D.Cal.)

In 1988, Schneider brought an action against ACS in the United States District of Northern California, accusing ACS of infringing Schneider's Bonzel patent through sale of its RX line of angioplasty catheters. While this suit was pending, two patents

---

8. In some designs the two tubes are joined, side-by-side. In other designs, the guide wire tube is *inside* the inflation tube. Thus, to the naked eye, a balloon dilatation catheter can appear as one very small tube, when in reality it is composed of two barely visible tunnels.

9. If a physician is not able to hold onto the end of the bare wire—while at the same time sliding the balloon catheter off the wire—the wire would be pulled out of the patient's body simultaneously.

issued to Paul G. Yock were assigned to ACS. The first, United States Patent No. 5,040,548, issued on August 20, 1991, was entitled "Angioplasty Method" (the "Yock 1 patent"). The second, United States Patent No. 5,061,273, issued on October 29, 1991, was entitled "Angioplasty Apparatus Facilitating Rapid Exchange" (the "Yock 2 patent").

In response, in August of 1991, ACS brought suit against Schneider in the Northern District of California, alleging that Schneider's Monorail line of catheters infringed the Yock 1 and Yock 2 patents.

The parties reached a settlement on December 17, 1991, providing for a cross-license of the Bonzel and Yock patents, as well as for patents which might mature from patent applications emanating from the Bonzel and Yock patents. ACS agreed to pay $22 million to Schneider for infringement of the Bonzel patent. (*See* Schneider Mem. Mot. Dismiss, Ex. A (Settlement Agreement).) More recently, United States Patent No. 5,350,395 was issued on September 27, 1994 (the "Yock 3 patent"), as was United States Patent No. 5,451,233 on September 19, 1995 (the "Yock 4 patent").

2. *ACS v. SciMed,* No. C–91–20508–WAI (N.D.Cal.) and *ACS v. SciMed,* No. 3–91–20729–JW (N.D.Cal.)

In August and October of 1991, ACS also filed two actions against SciMed, the first for infringement of the Yock 1 patent and the second for infringement of the Yock 2 patent. Both cases were settled on December 1, 1991. SciMed agreed to pay a lump sum to ACS, plus a 20% royalty on infringing rapid-exchange catheters during a limited phase-out period.

3. *Schneider v. SciMed,* No. 3–91–Civ–241, 852 F.Supp. 813 (D.Minn.1994), *aff'd,* 60 F.3d 839 (Fed.Cir.), *cert. denied,* [—— U.S. ——], 116 S.Ct. 520, [133 L.Ed.2d 427] (1995) ("the *SciMed* action")

On April 23, 1991, Schneider filed suit against SciMed in the District of Minnesota. Schneider accused SciMed of infringing the Bonzel patent by making, using, and selling

its EXPRESS and RALLY dilatation catheters, and also sought a permanent injunction. (The RALLY catheter had replaced SciMed's EXPRESS catheter.) In a March 4, 1994 decision, Judge Alsop entered a judgment that the Bonzel patent was valid and enforceable; that Schneider did not engage in inequitable conduct at any time during the prosecution of the reexamination certificate or during the prosecution of the original patent; that SciMed had infringed the Bonzel patent by its manufacture and sale of the EXPRESS and RALLY catheters (but that such infringement was not willful); and that SciMed was liable for approximately $45 million in damages as well as prejudgment interest. In addition, Judge Alsop entered a permanent injunction, and an amended permanent injunction (on April 25, 1994), the specifics of which are detailed at *SciMed,* 852 F.Supp. at 868–69.

SciMed appealed the finding of validity, arguing that Judge Alsop had misconstrued caselaw and should have included engineers when evaluating whether the invention was obvious to "a person of ordinary skill in the relevant art." The Federal Circuit affirmed Judge Alsop's decision in *Schneider (Europe) AG v. SciMed Life Systems, Inc.,* 60 F.3d 839 (Fed.Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 520, 133 L.Ed.2d 427 (1995) stating that SciMed was "fundamentally wrong" in its arguments concerning conventional wisdom and obviousness.

4. *ACS v. BSC,* No. C–93–20330–RPA (N.D.Cal.)

In May of 1993, ACS sued BSC in the Northern District of California for alleged infringement of the Yock 1 and Yock 2 patents. BSC and ACS settled the litigation pursuant to a November 2, 1994 consent judgment in which BSC conceded that the Yock 1 and 2 patents were "not invalid [and] are enforceable...." (Schneider Mem. Mot. Dismiss, Ex. B (Consent Agreement).)

5. *BSC and SciMed Merger*

Following the *SciMed* action, BSC and SciMed signed a merger agreement on or around November 8, 1994, and consummated

the merger on or around February 24, 1995. (Schneider Undisputed Facts ¶ 1; BSC Opp. Partial Summ. J. (Validity) at 4). In June 1995, after receiving reassurance from Judge Alsop that the injunction against SciMed did not extend to SYNERGY catheters, SciMed began selling the catheters, which BSC continued to manufacture. (Schneider Undisputed Facts ¶ 6; BSC Opp. Partial Summ. J. (Validity) at 5.)

6. *ACS v. SciMed,* No. C–95–3580–DLJ (N.D.Cal.) and *ACS v. SciMed,* No. C–96–0950–DLJ (N.D.Cal.)

On October 10, 1995, ACS filed an action against SciMed for infringement of all four Yock patents based on sales of EXPRESS PLUS and EXPRESS PLUS II catheters. On March 12, 1996, ACS filed another action against SciMed for infringement of yet a fifth Yock patent (U.S. Patent No. 5,496,346, issued on March 5, 1996) based on sales of EXPRESS PLUS II and LEAP EXPRESS PLUS catheters. In its answer to the second action, SciMed asserted affirmative defenses of (1) invalidity, (2) unenforceability under the doctrine of patent misuse, and (3) noninfringement. In addition, SciMed filed a counterclaim which incorporated these defenses. On July 24, 1996, Judge Jensen (1) struck the invalidity defense but granted SciMed leave to amend, (2) struck the patent misuse defense with prejudice for failure to state a claim of patent misuse, estoppel, or laches, and (3) struck from the counterclaim all references to the affirmative defense of patent misuse.

## IV. *Framework For Review of these Motions*

### A. *Summary Judgment*

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In making this determination, I must view all facts in the light most favorable to the non-moving party. *See Woods v. Friction Materials, Inc.,* 30 F.3d 255, 259 (1st Cir.1994). However, the existence of an alleged factual dispute will not defeat a motion for summary judgment unless it is related to a genuine issue of material fact. *See Thomas v. Digital Equip. Corp.,* 880 F.2d 1486, 1489 (1st Cir.1989) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)). "A dispute is 'genuine' if 'the evidence about the fact is such that a reasonable jury could resolve the dispute in favor of the non-moving party.'" *Sanchez v. Alvarado,* 101 F.3d 223, 227 (1st Cir.1996) (quoting *Rivera–Muriente v. Agosto–Alicea,* 959 F.2d 349, 352 (1st Cir.1992)). "A fact is material if it carries with it the potential to affect the outcome of the suit under the applicable law." *Id.* (quoting *One Nat'l Bank v. Antonellis,* 80 F.3d 606, 608 (1st Cir.1996)).

Due to the overlapping nature of the pleadings, and the similarity to cross-motions for summary judgment, I must review the record in the light most favorable to the party opposing summary judgment and indulge all reasonable inferences in that party's favor. *See El Dia, Inc. v. Hernandez Colon,* 963 F.2d 488, 492 (1st Cir.1992). As explained in *El Dia,* "[i]n such a situation, 'the court must evaluate each motion separately, being careful to draw inferences against each movant in turn.'" *Id.* (citing *Griggs–Ryan v. Smith,* 904 F.2d 112, 115 (1st Cir.1990)).

Finally, I am mindful that "summary judgment is as appropriate in a patent case as in any other. When no genuine issue of material fact remains and the movant is entitled to judgment as a matter of law, the court should utilize the salutary procedure of Fed. R.Civ.P. 56 to avoid unnecessary expense to the parties and wasteful utilization of the jury process and judicial resources." *Barmag Barmer Maschinenfabrik A.G. v. Murata Machinery, Ltd.,* 731 F.2d 831, 835 (Fed. Cir.1984); *accord Becton Dickinson & Co. v. C.R. Bard, Inc.,* 922 F.2d 792, 795 (Fed.Cir. 1990).

### B. *Motions to Dismiss*

In reviewing the motions to dismiss in the antitrust action, I "accept[ ] all well-pleaded facts as true and draw[ ] all reasonable inferences in favor of the party dismissed." *Carreiro v. Rhodes Gill & Co.,* 68 F.3d 1443, 1446 (1st Cir.1995) (citing *Washington Legal*

*Found. v. Massachusetts Bar Found.*, 993 F.2d 962, 971 (1st Cir.1993)). However, a plaintiff's unsupported conclusions or interpretations of law will not be accepted. *See id.* I may grant dismissal "only if it appears beyond doubt that [the plaintiff] can prove no set of facts which would entitle him to relief." *Tamburello v. Comm–Tract Corp.*, 67 F.3d 973, 975 (1st Cir.1995) (citing *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957)), *cert. denied,* —— U.S. ——, 116 S.Ct. 1852, 134 L.Ed.2d 952 (1996).[10]

▮ I note that while there are no special pleading requirements for antitrust claims, *see New York Airlines, Inc. v. Dukes County*, 623 F.Supp. 1435, 1451 n. 14 (D.Mass. 1985) (citing *Corey v. Look*, 641 F.2d 32, 38 (1st Cir.1981)), "invocation of antitrust terms of art does not confer immunity from a motion to dismiss," *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1110 (7th Cir. 1984), *cert. denied,* 470 U.S. 1054, 105 S.Ct. 1758, 84 L.Ed.2d 821 (1985); *see The Estate Constr. Co. v. Miller & Smith Holding Co.*, 14 F.3d 213, 220–21 (4th Cir.1994) ("[I]t is not enough merely to state that a conspiracy has taken place."); *see also Boston & Maine Corp. v. Town of Hampton*, 987 F.2d 855, 863 (1st Cir.1993); *New York Airlines*, 623 F.Supp. at 1451 n. 14. Therefore, "when the requisite elements are lacking, the costs of modern federal antitrust litigation and the increasing caseload of the federal courts counsel against sending the parties into discovery when there is no reasonable likelihood that the plaintiffs can construct a claim from the events related in the complaint." *Car Carriers, Inc.*, 745 F.2d at 1106.

## C. *Choice-of-Law*

▮ The applicable law for patent-related issues is to be determined under the law as developed by the Federal Circuit. The applicable law for non-patent issues is the law of the regional circuit—in this case the First Circuit. Thus, general principles of res judicata and antitrust law are to be decided under the law of the First Circuit. *See Mars*

*Inc. v. Nippon Conlux Kabushiki–Kaisha*, 58 F.3d 616, 618 (Fed.Cir.1995); *Epic Metals Corp. v. H.H. Robertson Co.*, 870 F.2d 1574, 1576 (Fed.Cir.), *cert. denied,* 493 U.S. 855, 110 S.Ct. 160, 107 L.Ed.2d 117 (1989); *Argus Chemical Corp. v. Fibre Glass–Evercoat Co.*, 812 F.2d 1381, 1384 (Fed.Cir.1987). An issue such as res judicata is decided under the law of the Federal Circuit only where it "turns on substantive matters that are unique to patent law." *Broyhill Furniture Indus., Inc. v. Craftmaster Furniture Corp.*, 12 F.3d 1080, 1082 (Fed.Cir.1993); *accord Mars Inc.*, 58 F.3d at 618. Thus, a "pure question of the law of judgments," such as whether preclusion may be invoked based on a parent-subsidiary relationship, is governed by regional circuit law despite the fact that "[t]he setting in which the question arises is a patent case." *Mars Inc.*, 58 F.3d at 618. As a result, I will apply Federal Circuit law to the non-infringement issue and First Circuit law to the preclusion and antitrust issues.

## V. *Relitigation of Validity, Inequitable Conduct, and Unenforceability*

Schneider has moved for partial summary judgment (1) dismissing SciMed's second affirmative defense of unenforceability with prejudice, (2) that BSC may not relitigate the issue of the Bonzel patent's validity, and (3) that BSC may not relitigate the issue of inequitable conduct. Because these issues are material to both actions, I take them up at the outset.

Schneider argues that SciMed should not be allowed to relitigate issues of unenforceability because they were conclusively determined in the previous *SciMed* action. For the same reason, Schneider also contends that BSC, as SciMed's parent, should not be allowed to relitigate the issues of validity or inequitable conduct. BSC initially responds that Schneider has waived its preclusion arguments. In addition, SciMed asserts that it did not have the opportunity to litigate the issues fully and fairly in the previous action, because Schneider allegedly made misleading representations and omissions (regarding the

---

10. In determining the motion to dismiss, I may take judicial notice of other related cases, as well as consider the Schneider and ACS Settlement Agreement, which was adequately referenced in the Complaint. *See Watterson v. Page*, 987 F.2d 1, 3–4 (1st Cir.1993).

"person of ordinary skill in the art") to Judge Alsop and to SciMed during the *SciMed* action. Finally, BSC argues that it cannot be bound by an earlier judgment rendered against SciMed.

## A. *Waiver*

■ As a threshold issue, BSC argues that Schneider has waived any right to raise preclusion arguments because of the failure to assert them in the answer. While res judicata is an affirmative defense ordinarily considered waived unless pleaded, Fed.R.Civ.P. 8(c), there are exceptions. "The First Circuit has held that ... 'where the substantive rights of parties are not endangered, it is within the discretion of the district court to permit it to be raised by motion.'" *Hastings v. Union Boiler Co.*, 688 F.Supp. 63, 63–64 (D.Me.1988) (citing *Diaz–Buxo v. Trias Monge*, 593 F.2d 153, 154 (1st Cir.), *cert. denied*, 444 U.S. 833, 100 S.Ct. 64, 62 L.Ed.2d 42 (1979)).

The purpose of the pleading requirement in Fed.R.Civ.P. 8(c) "is to give the opposing party notice of the plea of estoppel and a chance to argue, if he can, why the imposition of an estoppel would be inappropriate." *Blonder Tongue Labs., Inc. v. University of Ill. Found.*, 402 U.S. 313, 350, 91 S.Ct. 1434, 1453, 28 L.Ed.2d 788 (1971). Mindful of this purpose, I find no prejudice from Schneider's failure to plead the issue, and I will allow the defense to be raised. Initially, I note Schneider's statement that it was unaware of any potential merger until the public announcement thereof on November 8, 1994 (Schneider Reply Partial Summ. J. (Validity) at 3), which was *after* Schneider filed its motion to dismiss (on June 15, 1994) and its answer and counterclaim (on October 27, 1994). Unlike the plaintiff in the ordinary case, therefore, BSC was not entitled to interpret Schneider's failure to plead the defense as an indication that it would not be raised. *Cf. Hastings*, 688 F.Supp. at 64 (allowing res judicata to be raised where earlier judgment had not yet been entered at time of answer).

Moreover, there is no question that, after the merger, BSC was aware of the preclusion issue. On April 10, 1995, as BSC itself notes, it asked Judge Alsop for clarification of the *SciMed* injunction, "because Schneider had accused Boston Scientific of contempt of Judge Alsop's Permanent Injunction Order in the Scimed action based on the merger with Scimed." (BSC Opp. Partial Summ. J. (Validity) at 4.) [11] Specifically, in a response to BSC's discovery objections, Schneider wrote on February 23, 1995: "It is our position that BSC's merger with Scimed, a company enjoined by the District Court in Minnesota, goes to the issue of willfulness, as well as those of invalidity, infringement and contempt." (Schneider Reply Partial Summ. J. (Validity), Ex. 2 at 2.)

Under these circumstances, Schneider's assertion of the preclusion issue in the instant motion for partial summary judgment cannot be characterized as unfair surprise. Finally, BSC has not been unduly prejudiced because it has had ample opportunity to respond to the preclusion arguments by way of briefs and oral argument. *See Diaz–Buxo*, 593 F.2d at 154; *see also Williams v. Ashland Eng'g Co.*, 45 F.3d 588, 593 (1st Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 51, 133 L.Ed.2d 16 (1995). As a result, I exercise my discretion to allow Schneider to raise the preclusion arguments through its motions for summary judgment.

## B. *Preclusion Arguments*

Schneider makes essentially two preclusion arguments. First, Schneider argues that, under the doctrine of stare decisis, the previous finding of validity is binding on this Court regardless of the parties before it. Second, Schneider argues that, under the doctrine of res judicata or—more specifically—issue preclusion, SciMed and BSC are estopped from raising the issues of unenforceability, validity, and inequitable conduct in the instant actions. Because these issues all turn, in this case, on the same underlying conduct, I consider them together.

11. Judge Alsop found that the injunction did not apply to the SYNERGY catheter. Thus, he did not reach the issue of whether the relationship between the two companies was a basis for binding BSC.

### 1. *Stare Decisis*

Under the doctrine of stare decisis, determinations of law are "binding in future cases before the same court or another court owing obedience to its decision." *Mendenhall v. Cedarapids, Inc.*, 5 F.3d 1557, 1570 (Fed.Cir.1993), *cert. denied,* 511 U.S. 1031, 114 S.Ct. 1540, 128 L.Ed.2d 192 (1994). Schneider contends that Judge Alsop's finding of validity in the SciMed action, which was affirmed by the Federal Circuit, was a determination of law which this Court must follow.

While the Federal Circuit "ha[s] not precluded invoking stare decisis where appropriate," that court "has rejected stare decisis as generally inappropriate on the issue of validity of a patent." *Id.* In other words, stare decisis applies where "the underlying factual findings in the two cases are the same," *id.* at 1571, but this identity of facts rarely occurs in patent validity cases, *see, e.g., Stevenson v. Sears Roebuck & Co.*, 713 F.2d 705, 711 (Fed.Cir.1983). First, the factual findings may differ, precluding application of stare decisis, where the records before the two courts differ: "A patent is not held valid for all purposes but, rather, not invalid on the record before the court." 5 F.3d at 1571 (quoting *Shelcore Inc. v. Durham Indus., Inc.*, 745 F.2d 621, 627 (Fed.Cir.1984)). Second, even if the records are identical, the defendant in the second case is entitled to have the evidence weighed by a new factfinder, who may validly reach different conclusions. *See id.* at 1570 ("[S]tare decisis only applies if the underlying factual findings in the two cases are the same, not merely the evidence."). Therefore, I am not bound to hold that the Bonzel patent is valid unless my findings of fact are the same as those of Judge Alsop in *SciMed*. Because this case is in the summary judgment stage, I have not yet made findings of fact. Consequently, it is premature for me to consider the applicability of stare decisis. I turn instead to the antecedent question whether the *SciMed* decision precludes SciMed and BSC from even raising the issues in this case.

### 2. *Issue Preclusion*

Issue preclusion, which is at times referred to as collateral estoppel or under the general heading of res judicata,[12] bars relitigation of any factual or legal issue that was actually decided in previous litigation whether on the same or a different claim. *See Grella v. Salem Five Cent Savs. Bank,* 42 F.3d 26, 30 (1st Cir.1994) (citing *Dennis v. Rhode Island Hosp. Trust,* 744 F.2d 893, 899 (1st Cir. 1984)).[13] The purpose of the doctrine is to "relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication." *Allen v. McCurry,* 449 U.S. 90, 94, 101 S.Ct. 411, 415, 66 L.Ed.2d 308 (1980).

Five essential elements must be established for a successful application of issue preclusion: (1) the issue sought to be precluded must be the same as that involved in the prior action; (2) the issue must have been actually litigated; (3) the issue must have been determined by a valid and binding final judgment; (4) the determination of the issue must have been essential to the judgment; and (5) the party to the second action must be the same as or in privity with the parties in the first action. *See NLRB v. Donna–Lee Sportswear Co.,* 836 F.2d 31, 34 (1st Cir.1987); *see also Grella,* 42 F.3d at 30.

---

**12.** While the term "res judicata" is now often used to denote claim preclusion, and the term "collateral estoppel" to denote issue preclusion, the First Circuit follows the traditional view that res judicata is a broad concept that includes both claim and issue preclusion. *See Grella v. Salem Five Cent Savs. Bank,* 42 F.3d 26, 30 (1st Cir. 1994).

**13.** Under claim preclusion, "a final judgment on the merits of an action precludes the parties or their privies from relitigating the claims that were raised or could have been raised in that action." *Apparel Art Int'l, Inc. v. Amertex Enters.*

*Ltd.,* 48 F.3d 576, 583 (1st Cir.1995) (citing *Allen v. McCurry,* 449 U.S. 90, 94, 101 S.Ct. 411, 414–15, 66 L.Ed.2d 308 (1980)). "The focal inquiry in assessing the applicability of [claim preclusion] is whether the causes of action raised in the separate lawsuits are the same." *Id.* Claim preclusion does not apply here because, while many of the issues are the same as in *SciMed,* the causes of action in the two cases (i.e., infringement based on sales of SYNERGY catheters and infringement based on sales of RALLY and EXPRESS catheters) do not share a common nucleus of operative facts.

**256**

In addition, the parties in the first action must have had a "full and fair opportunity" to litigate the issue. *See, e.g., DeCosta v. Viacom Int'l, Inc.,* 981 F.2d 602, 605 (1st Cir.1992), *cert. denied,* 509 U.S. 923, 113 S.Ct. 3039, 125 L.Ed.2d 725 (1993); *see also Monarch Life Ins. Co. v. Ropes & Gray,* 65 F.3d 973, 981 (1st Cir.1995) (citing *Blonder–Tongue Labs., Inc. v. University of Ill. Found.,* 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971)).

### a. *Relitigation of issues by SciMed*

■ In the *SciMed* litigation, Judge Alsop (1) granted summary judgment to Schneider on the defense of patent misuse after concluding that the defense had "no basis in fact or law," *Schneider (Europe) AG v. SciMed,* No. 3–91 CIV 241, slip op. at 4, 1993 WL 463204 (D.Minn. May 14, 1993); (2) concluded after trial that Schneider "[ha]d not engage[d] in inequitable conduct," *SciMed,* 852 F.Supp. at 868; and (3) concluded after trial that the Bonzel patent "[wa]s valid and enforceable," *id.* SciMed, acknowledging that it *"did* litigate the validity and unenforceability issues in Minnesota," concedes that "[u]nder normal circumstances Schneider would be justified in asking that *Scimed* be subject to issue and claim preclusion based on the Minnesota judgment." (SciMed Opp. Partial Summ. J. Unenforceability at 3.) SciMed's opposition, therefore, rests upon its assertion that it was denied a "full and fair opportunity" to litigate these issues before Judge Alsop.

A party is denied a full and fair opportunity to litigate an issue if "he did not have a fair opportunity procedurally, substantively and evidentially to pursue his claim." *Blonder–Tongue,* 402 U.S. at 333, 91 S.Ct. at 1445. While an "appropriate inquir[y]" would be "whether without fault of his own the [party] was deprived of crucial evidence or witnesses," the Supreme Court has noted that "no one set of facts, no one collection of words or phrases, will provide an automatic formula for proper rulings on estoppel pleas. In the end, decision will necessarily rest on the trial courts' sense of justice and equity." *Id.* at 333–34, 91 S.Ct. at 1445. SciMed,

apparently interpreting the term "crucial evidence" rather broadly, asserts that a full and fair opportunity to litigate "presupposes complete access to *all* material information." (SciMed Opp. Partial Summ. J. Unenforceability at 6.) SciMed argues that issue preclusion should not apply because (1) Schneider withheld from discovery a Statement of Undisputed Facts that it had submitted in a different case, in which Schneider had asserted that the relevant "person of ordinary skill" included persons practicing as engineers; and (2) Schneider took the contrary position before Judge Alsop without disclosing its earlier stance. (*Id.* at 5–6.)

However, even when I assume that the *issue* of the relevant person of ordinary skill was central to the outcome of the Minnesota litigation, (*see id.* at 6), I find that Schneider's earlier *position* on the issue was not "crucial evidence" in the case. It is not unusual for a party to take contradictory positions in different litigations; it is even less unusual for a party to take a self-serving position in any given case. As a result, factfinders are influenced not by the fact that a party takes a particular position, but rather by the evidence offered to support it.

Moreover, it cannot be said that SciMed was deprived of the prior Statement of Undisputed Facts "without fault of [it]s own." 402 U.S. at 333, 91 S.Ct. at 1445. That document, filed in the prior litigation without being placed under seal, was and is a public document which could have been obtained by SciMed at any time. In response to SciMed's discovery request for all documents relating to any legal proceeding involving the Bonzel patent, Schneider responded that it "object[ed] to producing documents which are publicly available." (Greco Decl., Ex. 4 at 15.) Apparently, SciMed neither moved to compel production nor sought to obtain these documents on its own.

Because I find that the Statement of Undisputed Facts was not crucial evidence and, in any event, was at all times accessible by SciMed, I find that SciMed had a full and fair opportunity to litigate the issues before Judge Alsop.[14] All of the other criteria for

14. SciMed asserts that Schneider's actions

"ha[ve] great resonance also in the related area

collateral estoppel exist, and I therefore hold that SciMed may not relitigate the issues of validity, enforceability, or inequitable conduct.[15]  Consequently, I will grant Schneider's Motion for Partial Summary Judgment Dismissing SciMed's Second Affirmative Defense.

### b.  *Litigation of issues by BSC*

■ BSC argues that SciMed's previous litigation before Judge Alsop should not preclude BSC from litigating the same issues here.  The Supreme Court, while noting that due process is violated when preclusion is applied to "one who is neither a party nor in privity with a party" to the previous action, recently recognized that "the term 'privity' is now used to describe various relationships between litigants that would not have come within the traditional definition of that term." *Richards v. Jefferson Cty.*, 517 U.S. 793, —————— & n. 4, 116 S.Ct. 1761, 1765–66 & n. 4, 135 L.Ed.2d 76 (1996).  The "various relationships" referred to by the Court are not easily defined:

> To be sure, the term "privity" has been criticized as not aiding analysis, but simply stating a conclusion that a particular nonparty should be treated the same as a party for … preclusion purposes.  For that reason, courts have sometimes avoided the use of the term "privity" and instead have focused directly on the question whether the relationship between the parties is such that one party should enjoy the

benefit, or suffer the burden, of a judgment for or against another.

*Mars, Inc. v. Nippon Conlux Kabushiki–Kaisha*, 58 F.3d 616, 619 (Fed.Cir.1995).

Traditionally, privity has been found (1) where the nonparty substantially controlled the previous litigation, *see Gonzalez v. Banco Central Corp.*, 27 F.3d 751, 758 & n. 5 (1st Cir.1994); *Tyus v. Schoemehl*, 93 F.3d 449, 454 (8th Cir.1996), *cert. denied,* — U.S. ——, 117 S.Ct. 1427, 137 L.Ed.2d 536 (1997); (2) where the nonparty is a successor-in-interest to a prior party, *see Tyus*, 93 F.3d at 454; or (3) under the doctrine of "virtual representation," *see Gonzalez*, 27 F.3d at 758 & n. 5; *Tyus*, 93 F.3d at 454.  While it appears that BSC had a degree of limited involvement in the Minnesota case at the appellate stage, I find that BSC did not "substantially control" that litigation.  In addition, this case involves a different product, and thus BSC may not be estopped as a "successor-in-interest."  As a result, issue preclusion can apply only under the doctrine of virtual representation.[16]

The doctrine of virtual representation raises the same definitional problems as does the broader notion of privity.  The First Circuit has stated that "[t]here is no black-letter rule.  In the end, virtual representation is best understood as an equitable theory rather than as a crisp rule with sharp corners and clear factual predicates, such that a party's status as a virtual representative of a non-party must be determined on a case-by-

---

15.  Although Schneider's motion with respect to SciMed concerns "unenforceability," and its motions with respect to BSC concern "validity" and "inequitable conduct," I note again that these issues all involve the same underlying conduct.

16.  Schneider also urges application of an "alter ego" theory, which allows a court to "pierce the corporate veil"—and hold a parent corporation accountable for the liabilities of its subsidiary—after considering such factors as lack of independence between parent and subsidiary, fraudulent intent, and manifest injustice. *See, e.g., United Elec. Workers of Am. v. 163 Pleasant Street Corp.*, 960 F.2d 1080, 1093 (1st Cir.1992).  Although this theory itself is not directly applicable to the issue of collateral estoppel (in contrast to issues such as financial liability and personal jurisdiction), *see Restatement (Second) of Judgments* § 59(5), the underlying principles are relevant to virtual representation and will be treated below.

of relieving a litigant from a prior judgment obtained against it by fraud." (SciMed Opp. Partial Summ. J. Unenforceability at 11.)  I need not decide whether "fraud on the court," a ground for relief from judgment under Fed. R.Civ.P. 60(b), is also a separate defense to the application of collateral estoppel, because I find that Schneider did not carry out an "unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter." *Geo. P. Reintjes Co. v. Riley Stoker Corp.*, 71 F.3d 44, 48 n. 5 (1st Cir.1995) (quoting *Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, 1118 (1st Cir.1989)).

However, I decide only that SciMed has failed here to show facts sufficient for me to set aside the preclusive effect of the *SciMed* decision.  I express no opinion as to whether SciMed is entitled to Rule 60(b) relief from Judge Alsop himself.

case basis." *Gonzalez*, 27 F.3d at 761 (citations omitted).

Nevertheless, the precedents do provide me with adequate guidance for deciding this case. The *Gonzalez* court "placed the theory ... on a short tether" by emphasizing that the nonparty cannot be bound based merely on an identity of interests with the party to the earlier action. *Id.* at 760. Moreover, "virtual representation has a pronounced equitable dimension. Thus, ... virtual representation will not serve to bar a nonparty's claim unless the nonparty has had actual or constructive notice of the earlier litigation, and the balance of equities tips in favor of preclusion." *Id.* On the other hand, privity may be established in proper circumstances even if the nonparty did not authorize representation by the party. *See In re Medomak Canning*, 922 F.2d 895, 901 (1st Cir.1990).

The customarily difficult question of virtual representation is presented in an unusual posture by this case, because the merger relationship between BSC and SciMed did not arise until after the *SciMed* litigation had been substantially completed and after this case had been filed by BSC.[17] Indeed, both parties candidly confess their inability to locate a single case dealing with this unique fact situation. I can, therefore, without departing from available precedent, proceed on the assumption that collateral estoppel may in some cases be based on the relationship that exists at the time of the subsequent litigation. *Cf. Richards v. Jefferson Cty.*, 517 U.S. 793, ——, 116 S.Ct. 1761, 1766, 135 L.Ed.2d 76 (1996) (stating that collateral estoppel applies "when it can be said that there *is* 'privity' between a party to the second case and a party who *is* bound by an earlier judgment") (emphasis added). To be sure, while a subsequently-formed relationship is not a *per se* barrier to issue preclusion, such timing issues may well affect the balance of equities in a particular case. Therefore, I must address the question of whether the subsequently-formed relationship in this case is "such that one party should enjoy the benefit, or suffer the burden, of a judgment for or against another." *Mars, Inc.*, 58 F.3d at 619.

Specifically, I find that the criteria set forth for the application of the virtual representation theory have been met in this case. *See Gonzalez*, 27 F.3d at 760. First, there is—and was at the time of the previous litigation—a clear identity of interests between BSC and SciMed with respect to the relevant issues—i.e., the validity and enforceability of a patent, held by a common competitor, which was potentially infringed by both companies.

Second, there can be no doubt that BSC had actual notice of the Minnesota litigation while it was being conducted, and BSC certainly had such notice when it decided to merge with SciMed. (BSC Material Facts ¶ 5.)

Third, the balance of equities tips decidedly in favor of preclusion. Among the factors to be weighed are "[c]lose nonlitigating relationships with a party, participation, apparent acquiescence, and perhaps deliberate maneuvering to avoid the effects of the first action." *Crane v. Department of Agriculture, Food & Rural Resources*, 602 F.Supp. 280, 288 (D.Me.1985) (quoting 18 Charles A. Wright et al., *Federal Practice & Procedure* § 4457, at 502 (West 1981)). Thus, BSC's strongest arguments stem from the fact that its relationship with SciMed was not formed until the later appellate stages of the Minnesota case. As a result, BSC had almost no opportunity to participate directly in the earlier litigation, or to acquiesce to SciMed's actual litigation strategy. While these factors themselves do weigh against precluding BSC from litigating the issues here, I find that several considerations mitigate any inequitable impact upon BSC.

Most importantly, BSC was fully aware of the Minnesota litigation when it chose to merge with SciMed. According to BSC, the merger discussions did not begin until after Judge Alsop entered his judgment, and during those discussions BSC's counsel contact-

---

17. Schneider makes much of the fact that BSC did not assert inequitable conduct until after the merger, and BSC responds that it had long contemplated doing so but had waited until it was satisfied that a sufficient basis existed. Because I find below that BSC is bound on both issues, this dispute is irrelevant to my decision.

ed SciMed's counsel to assess the status of the litigation. (BSC Material Facts. ¶¶ 3, 5.) Especially in light of its failure, even at this point, to identify precedent on the issue, BSC could not justifiably have held a firm expectation that it would be allowed to relitigate issues which SciMed had recently argued without success. Rather, the potential collateral estoppel effect of the *SciMed* judgment was simply one of the potential liabilities to which BSC knowingly subjected itself when it decided to enter into the merger. Moreover, BSC can hardly argue with a straight face that SciMed's representation of BSC's interests was less than adequate: indeed, SciMed's in-house patent counsel during that case, John A. Rissman, has been hired by BSC to be *its* in-house patent counsel and is now assisting in the management of this litigation. (BSC Material Facts ¶ 8.) As a result, upon fact-intensive analysis of the circumstances of this case, application of issue preclusion does not appear unfair to BSC.

By contrast, allowing BSC to litigate validity and inequitable conduct appears inappropriate. Two of the factors mentioned above, close nonlitigating relationships and avoidance of the effects of the first judgment, are especially relevant. As parent and wholly-owned subsidiary, BSC and SciMed clearly have the type of close relationship which, if not indicating privity *per se,* at the very least contributes significantly to a finding that BSC should be held to have assumed the burden of a judgment against SciMed. *See Mars Inc. v. Nippon Conlux Kabushiki–Kaisha,* 58 F.3d 616, 619 (Fed.Cir.1995) (applying claim preclusion based in part on fact that present and former defendants were parent and wholly-owned subsidiary); *Nordhorn v. Ladish Co.,* 9 F.3d 1402, 1405 (9th Cir.1993) ("Corporate affiliations may be relevant in determining whether two parties are in privity for purposes of issue or claim preclusion."); *G & T Terminal Packaging Co. v. Consolidated Rail Corp.,* 719 F.Supp. 153, 159 (S.D.N.Y.1989) ("Subsidiaries are in privity with their principal for res judicata purposes when, as here, they sufficiently represent the principal's interests."); *see also Johnson & Johnson v. Coopervision, Inc.,* 720 F.Supp. 1116, 1123 (D.Del.1989).

Schneider suggests that the relationship is especially close—and, indeed, that I should treat BSC and Schneider as one entity—due to an alleged failure to maintain corporate formalities. In light of the fact that BSC and SciMed have merged relatively recently, however, I do not find such transgressions— when I view the evidence in the light most favorable to BSC—to be sufficient here. The more significant consideration is the relationship between BSC and SciMed with respect to the SYNERGY catheters at issue in this case. *See Mars Inc.* 58 F.3d at 619 (applying claim preclusion based in part upon "[t]he relationship between [the parent] and its wholly-owned subsidiary with respect to the importation and sales of the [product at issue]"). While BSC continues to manufacture the SYNERGY catheters, it has transferred all sales of those products to SciMed. (BSC Opp. Partial Summ. J. Validity at 5.) *See* 58 F.3d at 619 ("With respect to the machines at issue in this case, [the subsidiary] served as the intermediary between [the parent] and the ultimate purchasers."). Therefore, I find that the effective identity of the relevant nonlitigating relationship between BSC and SciMed weighs heavily in favor of applying collateral estoppel.

Finally, due to the nature of the relationship outlined above, litigation by BSC of validity and inequitable conduct would effectively amount to relitigation of those issues by SciMed. I recognize that, under applicable patent doctrines, SciMed stands to benefit if *any* party successfully challenges the validity or enforceability of Schneider's patent. Nevertheless, the situation is different where, as here, the party litigating the issue the second time is so closely related to the party bound by an earlier judgment. Thus, the First Circuit has noted that the relevant considerations in the privity analysis include not only whether the nonparty "had an opportunity vicariously to present evidence and argument" in the first action, but also whether the party in the first action is now "using [the nonparty] as its agent for the purpose of evading the [earlier] judgment." *General Foods Corp. v. Massachusetts Dep't of Pub. Health,* 648 F.2d 784, 790 (1st Cir.1981); *see Crane v. Department of Agriculture, Food & Rural Resources,* 602 F.Supp. 280, 288–89

(D.Me.1985). Because litigation of the issues by BSC would allow SciMed, its wholly-owned subsidiary, to evade the Minnesota judgment,[18] failure to apply collateral estoppel would be seriously unfair to Schneider and would undermine the public policies behind that doctrine.

In sum, while emphasizing that no one factor is dispositive, I find that the equitable considerations weighing in favor of allowing BSC to litigate the issues are outweighed by those in favor of preclusion. The theory of virtual representation applies to the facts of this case. In other words, I consider BSC to be in privity with SciMed, because the relationship between the parties is such that BSC should be held to have assumed the burden of Judge Alsop's judgment against SciMed on the issues of validity and inequitable conduct. *See Mars, Inc.*, 58 F.3d at 619. Consequently, I will grant Schneider's Motion for Partial Summary Judgment That Boston Scientific May Not Relitigate the Issue of Validity, and I will grant Schneider's Motion for Partial Summary Judgment That Boston Scientific May Not Relitigate the Issue of Inequitable Conduct.[19]

VI. *Non-Infringement*

A. *The Contours of Patent Infringement Law*

Because neither SciMed nor BSC may contest the Bonzel patent's validity or enforceability, I will next address the issue of BSC's alleged infringement. Both the Supreme Court and the Federal Circuit have had occasion recently to clarify the dimensions of patent infringement law, and I turn first to a review of the law.

A determination regarding patent infringement is a two-step process. First, the court interprets the claim to determine its scope and meaning. *See Dolly, Inc. v. Spalding & Evenflo Cos.*, 16 F.3d 394, 397 (Fed.Cir.1994); *Becton Dickinson & Co. v. C.R. Bard, Inc.*, 922 F.2d 792, 796 (Fed.Cir.1990). Second, the claim as properly construed must be compared to the accused device. *See Carroll Touch, Inc. v. Electro Mechanical Sys.*, 15 F.3d 1573, 1576 (Fed.Cir.1993).

The first step, interpretation of claims, is exclusively within the province of the court. *See Markman v. Westview Instruments, Inc.*, 517 U.S. 370, ——, 116 S.Ct. 1384, 1396, 134 L.Ed.2d 577 (1996). Claim interpretation requires consideration of the claim language, the specification, the prosecution history, and expert testimony. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed.Cir.1995), *aff'd*, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996); *Texas Instruments Inc. v. United States Int'l Trade Comm'n*, 988 F.2d 1165, 1171 (Fed.Cir. 1993).[20] It is important to emphasize that the specification, prosecution history, and expert testimony are employed only to assist the court in understanding the meaning of the claim language. That is, such evidence may not be used to in any way "enlarge, diminish, or vary" claim limitations which are otherwise clear. *See Markman*, 52 F.3d at

---

**18.** BSC stresses that it brought this litigation prior to the merger, and that it is still exposed to significant potential liability for its pre-merger sales and continuing manufacture of the SYNERGY catheters. Thus, BSC appears to argue that SciMed's effective relitigation of the issues is merely an inevitable consequence of BSC's need to litigate the issues on its own behalf. To the contrary, I find that BSC is responsible for bringing about this state of affairs by voluntarily merging with and transferring SYNERGY sales to SciMed.

**19.** I acknowledge that "[w]hen questions of validity and infringement are raised in the same proceeding, the trial court should decide both issues and enter a judgment on both." *Simmons Fastener Corp. v. Illinois Tool Works, Inc.*, 739 F.2d 1573, 1576 (Fed.Cir.1984), *cert. denied*, 471 U.S. 1065, 105 S.Ct. 2138, 85 L.Ed.2d 496 (1985); *accord In re Lockwood*, 50 F.3d 966, 968

n. 2 (Fed.Cir.), *vacated on other grounds*, 515 U.S. 1182, 116 S.Ct. 29, 132 L.Ed.2d 911 (1995); *Lindemann Maschinenfabrik GMBH v. American Hoist & Derrick Co.*, 730 F.2d 1452, 1463 (Fed. Cir.1984). As a result, I emphasize that my refusal to reach the validity issue is based not upon my holding on the infringement issue, but rather upon my holding that the validity issue may not be raised.

**20.** "Claims" are numbered paragraphs that provide the concise formal definition of the invention. The "specification" contains a written description of the invention that must enable one of ordinary skill in the art to make and use the invention. However, only the claims govern in setting limitations. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed.Cir. 1995), *aff'd*, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996).

979–81. Thus, "[u]nless the specification or the file history indicates that the inventor intended otherwise, a claim term will be accorded its ordinary and accustomed meaning." *Wolverine World Wide, Inc. v. Nike, Inc.*, 38 F.3d 1192, 1196 (Fed.Cir.1994). For example, while the patentee is permitted to be his own lexicographer, any special definition given to a word must be clearly stated in the specification. *See Markman*, 52 F.3d at 980.

In the second step, infringement is found if the accused device contains elements literally identical or substantially equivalent to each claimed element of the patented invention. *See Warner–Jenkinson Co. v. Hilton Davis Chemical Co.*, —— U.S. ——, ——, 117 S.Ct. 1040, 1054, 137 L.Ed.2d 146 (1997); *Wolverine World Wide, Inc.*, 38 F.3d at 1196. This is often referred to as the "all elements" rule of *Pennwalt Corp. v. Durand–Wayland, Inc.*, 833 F.2d 931, 935 (Fed.Cir.1987), *cert. denied*, 485 U.S. 961, 108 S.Ct. 1226, 99 L.Ed.2d 426 (1988).

If no literal infringement is found, the factfinder analyzes whether the patent is violated under the doctrine of equivalents. In the landmark case of *Graver Tank & Manufacturing Co. v. Linde Air Products Co.*, 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950), the Supreme Court stated that limiting patent enforcement to literal infringement "would place the inventor at the mercy of verbalism and would be subordinating substance to form," which would encourage infringers "to make unimportant and insubstantial changes and substitutions which, though adding nothing, would be enough . . . [to evade] the reach of the law." *Id.* at 607, 70 S.Ct. at 856. Earlier this year, on the other hand, the Supreme Court cautioned that the doctrine must not be expanded so far as to violate the rule against judicial enlargement of the scope of patent claims. *Warner–Jenkinson Co. v. Hilton Davis Chem. Co.*, —— U.S. ——, ——, 117 S.Ct. 1040, 1049, 137 L.Ed.2d 146 (1997).

The Court explained that these twin evils may be avoided by finding infringement only when each element or part of the patented device, rather than the device as a whole, has an equivalent in the accused device. *Id.; see*

*Dolly, Inc.*, 16 F.3d at 398. This approach does not appear to be inconsistent with the Federal Circuit's observation in *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 72 F.3d 857, 861 (Fed.Cir.1995), *remanded*, —— U.S. ——, 117 S.Ct. 1240, 137 L.Ed.2d 323 (1997), that "there need not be one-to-one correspondence between the components of an accused device and the claimed invention." I recognize that the Supreme Court has vacated *Festo Corp.* and remanded the case for reconsideration in light of *Warner–Jenkinson Co.;* the observation, however, seems to me to continue to be well founded. Thus, multiple elements of the patented device may each have an equivalent in the same element of the accused device, and multiple elements of the accused device may together make up the equivalent of a single element of the patented device. *See Dolly, Inc.*, 16 F.3d at 398.

The traditional test under the doctrine of equivalents is whether "the substituted element in the accused device performs substantially the same function, in substantially the same way, to produce substantially the same result as the claimed element." *Eastman Kodak Co. v. Goodyear Tire & Rubber Co.*, 114 F.3d 1547, 1560 (Fed.Cir.1997) (citing *Warner–Jenkinson*, —— U.S. at ——, 117 S.Ct. at 1054); *see, e.g., Wright Med. Tech., Inc. v. Osteonics Corp.*, 122 F.3d 1440, 1443–44 (Fed.Cir.1997). However, the Federal Circuit recently observed that "[i]t goes too far . . . to describe the function-way-result test as 'the' test for equivalency. . . . As technology becomes more sophisticated, and the innovative process more complex, the function-way-result test may not invariably suffice to show the substantiality of the differences." *Hilton Davis Chem. Co. v. Warner–Jenkinson Co.*, 62 F.3d 1512, 1518 (Fed. Cir.1995), *rev'd on other grounds*, —— U.S. ——, ——, 117 S.Ct. 1040, 1054, 137 L.Ed.2d 146 (1997) ("We expect that the Federal Circuit will refine the formulation of the test for equivalence in the orderly course of case-by-case determinations, and we leave such refinement to that court's sound judgment in this area of its special expertise.").

The Federal Circuit listed several considerations beyond the traditional test that may

be relevant to an investigation of equivalence. For example, "[t]he known interchangeability of the accused and claimed elements is potent evidence that one of ordinary skill in the relevant art would have considered the change insubstantial." *Id.* at 1519. In addition, evidence of copying is also relevant because "[w]hen an attempt to copy occurs, the fact-finder may infer that the copyist, presumably one of some skill in the art, has made a fair copy, with only insubstantial changes." *Id.* On the other hand, "[w]hen a competitor becomes aware of a patent, and attempts to design around its claims, the fact-finder may infer that the competitor, presumably one of skill in the art, has designed substantial changes into the new product to avoid infringement." *Id.* at 1520.

Finally, the scope of the doctrine of equivalents is limited by the application of prosecution history estoppel. "Prosecution history estoppel bars the patentee from recapturing subject matter that was surrendered by the patentee during prosecution in order to promote allowance of the claims." *Insituform Tech., Inc. v. Cat Contracting, Inc.,* 99 F.3d 1098, 1107 (Fed.Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1555, 137 L.Ed.2d 703 (1997). In other words, there is no infringement if an element of the accused device, though substantially equivalent to an element of the patented device, was originally included within the scope of the claims but was relinquished in order to secure the patent. Estoppel applies when the claim has been "narrowed by amendment for a 'substantial reason related to patentability,' such as to avoid a prior art rejection." *Regents of Univ. of Cal. v. Eli Lilly & Co.,* 119 F.3d 1559, 1573 (Fed.Cir.1997) (quoting *Warner–Jenkinson,* —— U.S. at ——–——, 117 S.Ct. at 1049–51). In this situation, the patentee bears the burden of proving that the amendment had a purpose unrelated to patentability. *Warner–Jenkinson,* —— U.S. at ——, 117 S.Ct. at 1054. In addition, the Federal Circuit has held that "[e]stoppel may arise solely from prosecution arguments made in support of non-amended claim language." *Baxter Diagnostics, Inc. v. PB Diagnostic*

*Sys., Inc.,* 57 F.3d 1082 (Table), 1995 WL 253177, at *6 (Fed.Cir.1995) (citing *Haynes Int'l, Inc. v. Jessop Steel Co.,* 8 F.3d 1573, 1579 (Fed.Cir.1993)); *see Texas Instruments, Inc. v. United States Int'l Trade Comm'n,* 988 F.2d 1165, 1174 (Fed.Cir.1993).

Ultimately, while application of prosecution history estoppel is a question of law, *see Haynes Int'l,* 8 F.3d at 1574, infringement under the doctrine of equivalents is a question of fact, *see Hilton Davis,* 62 F.3d at 1520. Accordingly, "[w]here the evidence is such that no reasonable jury could determine two elements to be equivalent, district courts are obliged to grant partial or complete summary judgment." *Warner–Jenkinson,* —— U.S. at —— n. 8, 117 S.Ct. at 1053 n. 8; *see, e.g., Becton Dickinson & Co. v. C.R. Bard, Inc.,* 922 F.2d 792, 795 (Fed.Cir.1990); *Townsend Eng'g v. Hitec Co.,* 829 F.2d 1086, 1092 (Fed.Cir.1987).

### B. *The Bonzel Claims*

■ Turning to the record before me, BSC's overriding argument is that its entire family of SYNERGY catheters—, SYNERGY II, SYNERGY (Europe) and OUTSIDER—lack a guide wire tube that *terminates,* and instead employ a full-length guide wire tube with an exit hole or port.[21] The pertinent language from Claim 1 reads:

> A dilatation catheter comprising ... a first, relatively long, elongated hollow tube having distal and proximal ends and opening adjacent its distal end into the interior of the expandable balloon, the first tube being sealingly connected to the proximal end of the balloon, and a second, relatively short, elongated hollow tube integral with said first tube, having distal and proximal ends, and adapted to receive a guide wire in a sliding fit, ... and the second tube terminating at its proximal end substantially distally of the proximal end of the first tube in an aperture open to the exterior of the catheter....

(BSC Mot. Summ. J. Non–Infringement, Ex.

---

**21.** In addition, BSC argues that its ENERGY and HIGH ENERGY catheters are not subject to United States patent laws because they are all manufactured and sold exclusively outside the United States.

2.)[22] Each independent claim of the Bonzel patent (claims 1, 4, 5, 6, 11, 17, 22, 27) includes the claim language which requires a short second tube that terminates and first tube sufficiently stiff to advance the balloon. The dependent claims (claims 3, 7–10, 12–16, 18–21, 23–26), incorporate the independent claims and thus the same limitations. (BSC Mem. Summ. J. Non–Infringement at 12 n. 7.)

Not content to rely upon the plain meaning of the claim language, BSC turns to the surrounding claims, specifications, and prosecution history to support its argument that the Bonzel patent excludes a full-length second tube.

First, surrounding claim language states:

... said first tube having sufficient stiffness that the second tube and expandable balloon can readily be advanced or withdrawn together in use along the guide wire by exerting a pushing or pulling force upon the first tube....

(BSC Mot. Summ. J. Non–Infringement, Ex. 2.) BSC reasons that the first tube would not be required to have stiffness sufficient to advance the entire catheter if the claim included a full-length second tube. (BSC Mem. Summ. J. Non–Infringement at 19.)

Second, Bonzel argued in the prosecution history that his catheter, by eliminating most of the guide wire tube, had a smaller outer profile and therefore allowed more room outside the catheter for the injection of a dye used to visualize the angioplasty procedure. (BSC Mot. Summ. J. Non–Infringement, Ex. 12, at 40.)

Finally, Bonzel also argued in the prosecution history that his catheter was non-obvious because it went against the conventional wisdom by eliminating the ability to perform guide wire exchange, which requires a full-length guide wire tube. (*Id.* at 98–99.)

In response, Schneider does not appear to contest BSC's basic interpretation of the Bonzel claims—i.e., that the claims exclude a full-length second tube. Instead, Schneider emphasizes various other aspects of the claims, such as the requirement that the second tube be hollow and adapted to receive the guide wire in a sliding fit, and the fact— or at least the SciMed court's finding of fact—that the first tube may be constructed of several pieces. (Schneider Opp. Summ. J. Non–Infringement at 5–6.) In essence, Schneider contends that the "second tube" of the Bonzel claim actually means the portion of the catheter through which the guide wire travels, and the "first tube" actually means any structure which imparts stiffness to the catheter. Of course, this interpretation is specifically crafted to include the SYNERGY catheters within the scope of the claims.

In any event, I find that the claim language—e.g., "first tube," "second tube," "relatively short," "terminating," "sufficient stiffness"—is clear when given its ordinary and accustomed meaning. The Bonzel claim includes a balloon, a long inflation tube, and a short guide wire tube which comes to an end near the balloon end of the catheter. While the first tube must have *sufficient* stiffness to advance the entire catheter on its own, the first tube may obtain *additional* stiffness from other elements. In addition, nothing in the claim precludes additional structures beyond the elements mentioned above. While the surrounding evidence cited by BSC confirms the plain meaning of the claims, I find consideration of such evidence unnecessary. Schneider has failed to point to any evidence clearly showing that the claim language was given a special meaning, and therefore the ordinary and accustomed meaning of that language suffices to interpret the claims.

### C. *Literal Infringement*

Having interpreted the claim language, I compare—under the second step of patent infringement analysis—the claims to the accused device. I look first for literal infringement. Each claim must be present

---

22. The description of the invention and the drawings required by 35 U.S.C. §§ 112 and 113 are set forth in the original Bonzel patent. (BSC Mot. Summ. J. Non–Infringement, Ex. 1.) However, the claims of Bonzel's original patent have been superseded and replaced by a Reexamination Certificate. (BSC Mot. Summ. J. Non–Infringement, Ex. 2.) The claims contained in the latter document are legally operative here for purposes of infringement analysis. *See* 35 U.S.C. § 307; *SciMed*, 852 F.Supp. at 827–28.

in the accused device, *Dolly, Inc.*, 16 F.3d at 398, and BSC argues here that a terminating second tube is absent. As discussed above, the SYNERGY catheters employ a full-length guide wire tube with an exit hole at approximately the same location where the Bonzel guide wire tube terminates. By retaining the full-length guide wire tube, BSC's device allows the catheter to be convertible to over-the-wire mode, and ensures sufficient stiffness without relying on the inflation tube.

Schneider's response, foreshadowed above, is encapsulated in its diagram of the SYNERGY catheters on page 8 of its opposition brief. Schneider depicts the second tube as running from the balloon end of the catheter to the aperture at which the guide wire exits when the catheter is used in rapid exchange mode. The remainder of the structure, running from the aperture to the physician end of the catheter, is portrayed as part of the first tube. Schneider argues that the proximal portion of the structure cannot be considered part of the second tube because, at least when filled with a "stylet" for enhanced stiffness, the structure is neither "hollow" nor "adapted to receive a guide wire in a sliding fit." (Schneider Opp. Summ. J. Non–Infringement at 11–12 & Ex. 1.)

I reject Schneider's characterization and find that there is no genuine issue as to literal infringement because no reasonable jury would conclude that the SYNERGY catheters literally meet the Bonzel claims. Notwithstanding Schneider's efforts, the SYNERGY catheters clearly have two long tubes of approximately equal length. Rather than "terminating" as required by the claims, the second tube merely has an aperture open to the exterior of the catheter near the balloon end. Regardless of whether it is filled with a stylet, the tube itself continues for the entire length of the catheter.[23]

In essence, Schneider has attempted to expand the Bonzel patent to cover any device which obtains rapid exchange capabilities by allowing the guide wire to exit the body of the catheter near its distal end. However, the literal terms of the claims are not so broad; rather, they contain the limitation that this result must be achieved through the "terminati[on]" of the second tube. Thus, Schneider can only show infringement if the second tube of the SYNERGY catheter, while not literally terminating, is the substantial equivalent of Bonzel's second tube. I now turn to that question.

### D. *Doctrine of Equivalents*

■ BSC contends that the SYNERGY catheters do not infringe under the doctrine of equivalents because the full-length second tube is not equivalent to Bonzel's terminating tube. (BSC Mem. Summ. J. Non–Infringement at 33–34.) Schneider responds that the SYNERGY catheters infringe the Bonzel patent under the function-way-result test: "The second tube, the guide wire tube of the BSC catheters in the rapid exchange mode which begins at the balloon tip and ends where the guide wire exits, serves the same function (of permitting the catheter to track along the guide wire), in the same way (having the guide wire inside the catheter body for a relatively short distance, a 'Monorail') to achieve the same result (a rapid exchangeable catheter)." (Schneider Opp. Summ. J. Non–Infringement at 24.) This argument fails for the same reason as Schneider's argument on literal infringement: Schneider's interpretation of the SYNERGY tube—i.e., as "begin[ning] at the balloon tip and end[ing] where the guide wire exits"—is simply untenable.

As explained above, the SYNERGY catheters do not literally infringe upon the Bonzel patent because the SYNERGY second tube extends over the full length of the catheter

---

23. While the second tube of the SYNERGY catheter, with or without stylet, clearly provides *additional* stiffness, there is a genuine issue as to whether the first tube nevertheless has *sufficient* stiffness on its own. In arguing that Schneider should not be granted summary judgment of infringement, BSC itself asserts that this is "a plainly contested issue of fact." (BSC Reply Summ. J. Non–Infringement at 20.) I note that Schneider's position—i.e., that the SYNERGY first tube does have sufficient stiffness—is based upon its erroneous view that the majority of the SYNERGY second tube is actually part of the first tube. As a result, Schneider will be hard-pressed to deny that the properly construed SYNERGY first tube has sufficient stiffness on its own. Nevertheless, on the evidence before me I cannot say that there is no genuine issue.

while the Bonzel second tube terminates near the distal end. Therefore, infringement will be found only if a full-length second tube with an exit hole is substantially equivalent to a relatively short second tube which terminates near the balloon end of the catheter. Properly construed, the functions of the respective tubes are the same (i.e., receiving the guide wire for a relatively short distance near the distal end of the catheter) and the results are the same (i.e., rapid exchange capability). However, the tubes perform the same function in *different ways* to reach the same result. Specifically, the SYNERGY second tube receives the guide wire for a short distance by allowing it to exit the catheter through a hole in the middle of the tube, while the Bonzel second tube performs that function by terminating near the balloon end of the catheter.[24]

As the Federal Circuit made clear in *Hilton Davis Chemical Co. v. Warner–Jenkinson Co.*, 62 F.3d 1512, 1518 (Fed.Cir.1995), *rev'd on other grounds*, —— U.S. ——, ——, 117 S.Ct. 1040, 1054, 137 L.Ed.2d 146 (1997), considerations beyond the function-way-result test are relevant to a determination of equivalence. First, I address whether there was "known interchangeability" between the Bonzel second tube and the SYNERGY second tube. *See id.* at 1519. In this respect, the most significant feature of the SYNERGY second tube beyond the rapid exchange

feature is its capability for guide wire exchange through use in an "over-the-wire" mode. As a result, I focus my inquiry on whether a full-length second tube with guide wire exchange capability was considered to be interchangeable with the shorter Bonzel tube.

It is significant that Bonzel, in arguments before the United States Patent and Trademark Office, emphasized that his device sacrificed guide wire exchange. (PTO Office Action, BSC Mot. Summ. J. Non–Infringement, Ex. 15, at 12.) The parties devote substantial portions of their briefs to the question of whether such statements give rise to prosecution history estoppel. It is debatable whether Bonzel "surrendered" the full-length second tube because, rather than abandoning an effort to include such a structure within the scope of his claims, he merely emphasized the novelty of its absence. Nevertheless, his statements do indicate that he considered guide wire exchange to be incompatible with rapid exchange capability.[25] Moreover, Schneider has presented no evidence showing that the respective tubes were known to be interchangeable either at the time of the Bonzel patent or at the time when BSC developed the SYNERGY catheters.[26]

Second, I consider whether BSC has copied the Bonzel catheter, making only insub-

24. In declining to find substantial equivalence under the function-way-result test, I reject—for the second time—Schneider's efforts to broaden the scope of its claim. Schneider's characterization of the "way" in which the Bonzel tube achieves rapid exchange capability effectively changes the inquiry to whether the accused device is one "having the guide wire inside the catheter body for a relatively short distance." However, Schneider cannot avoid the fact that the claims themselves describe the way in which that result is achieved—i.e., through "terminat[ion]" of the second tube. *See Dolly, Inc. v. Spalding & Evenflo Cos.*, 16 F.3d 394, 398 (Fed. Cir.1994) ("The doctrine of equivalents is not a license to ignore claim limitations.").

25. At the hearing on this motion, Schneider's counsel argued that the proximal portion of the SYNERGY second tube is the equivalent of additional structure contemplated in the Bonzel claim prosecution. Specifically, counsel pointed to Bonzel's suggestion that some of the advantages of the full-length second tube—namely, the ability to take distal pressure measurements and

to inject visualization dye—could be recovered in his device through the addition of yet a third lumen. This argument might have been persuasive if the proximal portion of the SYNERGY second tube served the same purposes as such a third lumen and had been located in conjunction with the guide wire tube simply in order to circumvent the claim language.

However, the primary purpose of SYNERGY's full-length second tube is not to provide pressure and dye capability, but rather to facilitate guide wire exchange. This feature apparently was not contemplated by Bonzel, and it makes the full-length second tube a necessary part of the catheter, rather than a structure strategically placed to avoid infringement.

26. I note that the interchangeability analysis likely is more directly applicable to such situations as where an accused device substitutes a slightly different chemical or other basic physical ingredient for a claimed ingredient of the patented device. This is because the knowledge of interchangeability can arise from the use of such ingredients in other settings.

stantial changes, or alternatively has succeeded in designing around the claims by making substantial changes. *See Hilton Davis*, 62 F.3d at 1519–20. There can be little doubt that BSC, aware of the Bonzel patent and Schneider's vigilant enforcement thereof, attempted to design around it. However, this only begs the question of whether BSC succeeded in doing so by making substantial changes.

Again, I focus on the fact that BSC changed an element of the Bonzel claim—i.e., the second tube—in such a way as to recover guide wire exchange capability. It is important to emphasize that there are two components to this change. First, BSC attempted to design around the Bonzel patent by *changing an element* of the patented device. Therefore, I am not faced with a situation where the accused device has elements substantially equivalent to all elements of the patented device but also improves the device by adding new elements. Such would be the case if, for example, the SYNERGY catheters had the short second tube or its equivalent but also had a third, full-length tube to be used for guide wire exchange. Second, BSC attempted to design around the Bonzel patent by changing the element in a useful way. Therefore, I am not faced with a situation where the accused device has elements which differ only superficially from the claimed elements. Such would be the case if, for example, the SYNERGY catheters had a full-length second tube which served no purpose other than to receive the guide wire between its distal end and exit hole.[27]

In the end, therefore, the question of "copying" versus "designing around" turns upon Schneider's argument that the convertibility feature of the SYNERGY catheters is insubstantial: "The BSC catheters have an added convertibility feature. Discovery has shown that BSC's convertibility is hardly advantageous. It was labeled a 'gimmick' by BSC and rejected in Europe. The catheters are sold in the rapid exchange form, and the convertibility feature is only rarely used."

(Schneider Opp. Summ. J. Non–Infringement at 27–28.)

However, Bonzel argued in 1984 that his device went against the conventional wisdom by sacrificing guide wire exchange capability, which "was of great benefit." (Bonzel Response, BSC Mot. Summ. J. Non–Infringement, Ex. 12 at 98, 102.) Schneider argues in response that such statements did not concern the conventional wisdom in 1991, when the SYNERGY catheters were first marketed, (Schneider Resp. BSC Material Facts Non–Infringement ¶ 10), but produces no evidence that the prevailing view had indeed changed. BSC's market studies at the time estimated that the over-the-wire capability would be utilized in roughly ten percent of all SYNERGY procedures. (Dep. of Timothy Wheeler, Schneider Opp. Summ. J. Non–Infringement, Ex. 15, at 112–13.) Moreover, the convertibility feature and over-the-wire capability clearly dominate BSC's promotion of the SYNERGY catheters. For example, the cover of BSC's brochure is filled by a photograph of a convertible sports car, which is framed by the words "SYNERGY: Convertible Rapid–Exchange PTCA Catheter" and "Rapid Exchange and Over-the-Wire in a Single Convertible Catheter." (BSC Mot. Summ. J. Non–Infringement, Ex. 18.) While it is of course possible that such efforts were designed to avoid infringement liability, it is doubtful that BSC could market its catheters on the strength of useless features.

After considering the function-way-result test, known interchangeability, copying, and designing around, I find that there is no genuine issue as to whether the full-length second tube of the SYNERGY catheters, which provides convertibility and over-the-wire capability, is equivalent to the truncated second tube of the Bonzel patent. The SYNERGY catheters "did not incorporate mere 'colorable' changes to avoid literal infringement;" rather, BSC "created a different product to compete in the marketplace." *Dolly, Inc. v. Spalding & Evenflo Cos.*, 16 F.3d 394, 400 (Fed.Cir.1994) (quoting *Graver*

27. Similarly, as noted above, the full-length second tube in the SYNERGY catheter does not serve a purpose which could just as easily be served by the addition of a separate structure unrelated to the claims.

Tank & Mfg. Co. v. Linde Air Prods. Co., 339 U.S. 605, 612, 70 S.Ct. 854, 858, 94 L.Ed. 1097 (1950)). Consequently, I will grant BSC's Motion for Summary Judgment of Non–Infringement.

## VII. *Failure to Raise Antitrust Claims as Counterclaim*

As a preliminary matter, Schneider and ACS argue that SciMed and BSC are precluded from bringing their antitrust claims. First, Schneider and ACS maintain that the antitrust causes of action were compulsory counterclaims in earlier litigation. Fed. R.Civ.P. 13(a) requires that a party plead any counterclaim which "arises out of the transaction or occurrence that is the subject matter of the opposing party's claims." Failure to raise such a counterclaim bars litigation of the claim in a future suit, so as "to prevent multiplicity of actions and to achieve resolution in a single lawsuit of all disputes arising out of common matters." *Carteret Savs. & Loan Ass'n v. Jackson*, 812 F.2d 36, 38 (1st Cir.1987). Second, Schneider and ACS maintain that the antitrust causes of action are barred by the doctrine of claim preclusion. Under claim preclusion, as noted above, "a final judgment on the merits of an action precludes the parties or their privies from relitigating the claims that were raised or could have been raised in that action." *Apparel Art Int'l, Inc. v. Amertex Enters. Ltd.*, 48 F.3d 576, 583 (1st Cir.1995) (citing *Allen v. McCurry*, 449 U.S. 90, 94, 101 S.Ct. 411, 414–15, 66 L.Ed.2d 308 (1980)). In response, BSC and SciMed contend that neither Rule 13(a) nor claim preclusion applies because the patent and antitrust claims are not sufficiently related.

Four criteria are relevant to a determination of whether a counterclaim is compulsory: (1) whether the issues of fact and law raised by the claim and counterclaim largely are the same; (2) whether res judicata would bar a subsequent suit on defendant's claim absent the compulsory counterclaim rule; (3) whether substantially the same evidence will support or refute plaintiff's claim as well as defendant's counterclaim; and (4) whether there is any logical relation between the claim and the counterclaim.

See *Tank Insulation Int'l, Inc. v. Insultherm, Inc.*, 104 F.3d 83, 85 (5th Cir.1997); *McCaffrey v. Rex Motor Transp., Inc.*, 672 F.2d 246, 248 (1st Cir.1982). The application of claim preclusion is governed by standards which are similar but not identical:

> The focal inquiry in assessing the applicability of [claim preclusion] is whether the causes of action raised in the separate lawsuits are the same.... A cause of action is defined as a set of facts which can be characterized as a single transaction or a series of related transactions. The cause of action, therefore, is a transaction that is identified by a common nucleus of operative facts.

*Apparel Art*, 48 F.3d at 583.

BSC and SciMed emphasize that their antitrust claims center upon the Schneider–ACS settlement and cross-licensing agreement, which was not at issue in the prior infringement actions. For their part, Schneider and ACS argue that the antitrust action is in truth another attempt by BSC and SciMed to relitigate the issues of validity and inequitable conduct. I note, however, that BSC and SciMed may not raise matters which already have been litigated, and thus I consider the antitrust complaint only as it stands when stripped of those issues.

BSC and SciMed also argue that, as a matter of law, antitrust claims are permissive rather than compulsory counterclaims in patent litigation. "[T]he Supreme Court has clearly stated that a counterclaim for treble damages is permissive in nature so that failure by a defendant to plead it in a prior patent suit does not bar a subsequent independent suit by him under the anti-trust laws." *Fowler v. Sponge Prods. Corp.*, 246 F.2d 223, 227 (1st Cir.1957) (citing *Mercoid Corp. v. Mid–Continent Investment Co.*, 320 U.S. 661, 64 S.Ct. 268, 88 L.Ed. 376 (1944)). However, while *Mercoid* has recently been followed by two federal courts of appeals, *see* *Tank Insulation*, 104 F.3d at 85; *Hydranautics v. FilmTec Corp.*, 70 F.3d 533, 536 (9th Cir.1995), several other courts have questioned its continuing validity and confined it narrowly to its facts, *see, e.g., Burlington Indus., Inc. v. Milliken & Co.*, 690 F.2d 380,

389 (4th Cir.1982), *cert. denied,* 461 U.S. 914, 103 S.Ct. 1893, 77 L.Ed.2d 283 (1983); *American Packaging Corp. v. Golden Valley Microwave Foods, Inc.,* No. 94–1839, 1995 WL 262522 at *4 (E.D.Pa. May 1, 1995); *Rohm & Haas Co. v. Brotech Corp.,* 770 F.Supp. 928, 933 (D.Del.1991); *Lewis Manufacturing Co., Inc. v. Chisholm–Ryder Co., Inc.,* 82 F.R.D. 745, 750 (W.D.Pa.1979).

Although bound by *Fowler,* I share the more recent expressions of doubt regarding the applicability of *Mercoid.* I need not, in any event, resolve this issue because I find that even if antitrust claims can be raised here, the complaint fails to state a claim under which relief can be granted.

### VIII. *Antitrust Analysis*

#### A. *Federal Claims*

##### 1. *Contours of the Law*

█ Section 2 of the Sherman Act holds liable "every person who shall monopolize, or attempt to monopolize, or combine or conspire to monopolize ... any part of the trade or commerce among the several States." 15 U.S.C. § 2. To prove a monopolization claim, a plaintiff must show (1) that the defendant has monopoly power in the relevant market and (2) that the defendant "has engaged in impermissible 'exclusionary' practices with the design or effect of protecting or enhancing its monopoly position." *Coastal Fuels of Puerto Rico, Inc., v. Caribbean Petroleum Corp.,* 79 F.3d 182, 195–96 (1st Cir.) (citation omitted), *cert. denied,* —— U.S. ——, 117 S.Ct. 294, 136 L.Ed.2d 214 (1996). In other words, the acquisition and maintenance of the power must be willful, rather than a result of legitimate means such as patents, superior products, business acumen, or historic accident. *See Eastman Kodak Co. v. Image Tech. Servs.,* 504 U.S. 451, 481, 112 S.Ct. 2072, 2089–90, 119 L.Ed.2d 265 (1992); *Barry Wright Corp. v. ITT Grinnell Corp.,* 724 F.2d 227, 230 (1st Cir.1983) (citing *United States v. Grinnell Corp.,* 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966)).

█ Attempted monopolization under § 2 of the Sherman Act requires proof of (1) anti-competitive or exclusionary conduct; (2) specific intent to monopolize; and (3) a dangerous probability that the attempt will succeed. *See Picker Int'l, Inc. v. Leavitt,* 865 F.Supp. 951, 958 (D.Mass.1994); *see also CVD, Inc. v. Raytheon Co.,* 769 F.2d 842, 851 (1st Cir.1985), *cert. denied,* 475 U.S. 1016, 106 S.Ct. 1198, 89 L.Ed.2d 312 (1986). Finally, the offense of conspiracy to monopolize requires proof of (1) concerted action; (2) overt acts in furtherance of the conspiracy; and (3) specific intent to monopolize. *See Lee v. Life Ins. Co. of N. Am.,* 829 F.Supp. 529, 540 (D.R.I.1993), *aff'd,* 23 F.3d 14 (1st Cir.), *cert. denied,* 513 U.S. 964, 115 S.Ct. 427, 130 L.Ed.2d 340 (1994). Thus, in all three allegations the plaintiff must set forth facts of exclusionary conduct that is willful and distinct from legitimate business practices, while "specific intent" to monopolize the relevant market is an essential requirement in both attempted monopolization and conspiracy to monopolize.

█ Section 1 of the Sherman Act makes unlawful any "contract, combination ..., or conspiracy, in restraint of trade or commerce among the several states." 15 U.S.C. § 1. The Supreme Court has long recognized that this sweeping language prohibits only unreasonable restraints of trade. *See Lee,* 829 F.Supp. at 534 (citing *Business Elec. Corp. v. Sharp Elec. Corp.,* 485 U.S. 717, 723, 108 S.Ct. 1515, 1518–19, 99 L.Ed.2d 808 (1988)). Some types of conduct are considered to be unreasonable "per se" because they are "manifestly anticompetitive" and require no in-depth analysis. *Id.* at 535. Generally, however, courts apply the "rule of reason," which seeks to identify, on a case-by-case basis, "those arrangements the anticompetitive consequences of which outweigh their legitimate business justification." *Clamp–All Corp. v. Cast Iron Soil Pipe Institute,* 851 F.2d 478, 486 (1st Cir.1988), *cert. denied,* 488 U.S. 1007, 109 S.Ct. 789, 102 L.Ed.2d 780 (1989); *see Interface Group, Inc. v. Massachusetts Port Auth.,* 816 F.2d 9, 10 (1st Cir.1987). In order to state a claim under this section, a plaintiff must allege (1) the existence of a contract, combination or conspiracy; (2) that unreasonably restrains trade either per se or under the rule of reason; and (3) that effects interstate trade or commerce. *See Lee,* 829 F.Supp. at 535;

*New York Airlines, Inc. v. Dukes Cty.*, 623 F.Supp. 1435, 1450 (D.Mass.1985).

In any antitrust action, plaintiffs must also set forth facts which show an antitrust injury. However, this refers not to actions that merely injure individual competitors, but rather to actions that harm the competitive process. *See Interface Group*, 816 F.2d at 10 (citing *Brown Shoe Co. v. United States*, 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962)); *Lee*, 829 F.Supp. at 535.

Finally, courts have recognized an implied and limited "patent" exception to the antitrust laws. *See Data General Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147, 1186 (1st Cir.1994). Indeed, the intersection of antitrust law and patent law is inherently complex because the two areas of law seek contradictory ends. "The patent is itself a government grant of monopoly and is therefore an exception to usual antitrust rules." 3 Philip Areeda & Donald Turner, *Antitrust Law* ¶¶ 704–07, at 117–45 (1978). The rationale for this exception is "grounded in an empirical assumption that exposing patent activity to wider antitrust scrutiny would weaken the incentives underlying the patent system, thereby depriving consumers of beneficial products." *Data General*, 36 F.3d at 1186.

While the acquisition of a patent is considered a "legitimate means" of competition, this does not exempt all patent-related activity from the grips of antitrust law. It is clear that the economic incentives provided by the patent laws were intended to benefit only those persons who legitimately acquire patent rights, and a patentee has no special protection based on a patent obtained by fraud. *See Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 174, 86 S.Ct. 347, 348–49, 15 L.Ed.2d 247 (1965). Thus, some courts have held that "where a patent has been lawfully acquired, subsequent conduct permissible under the patent laws"—such as·exclusion of competition through enforcement of the patent— "cannot trigger any liability under the anti-

trust laws." *SCM Corp. v. Xerox Corp.*, 645 F.2d 1195, 1206 (2d Cir.1981), *cert. denied*, 455 U.S. 1016, 102 S.Ct. 1708, 72 L.Ed.2d 132 (1982); *see also Data General Corp.*, 36 F.3d at 1185–86 n. 63. On the other hand, the patent may not be used illegitimately, for example, to foster price-fixing arrangements or extend the patent monopoly to other products through tying arrangements. *See Data General*, 36 F.3d at 1185–86 n. 63.

### 2. *The Complaint*

The allegations of the First Amended Complaint (the "complaint") can be grouped into three areas. First, Schneider and ACS entered into a settlement and cross-licensing agreement which caused the parties, either through express agreement or resulting incentives, (a) to abandon litigation over the validity and enforceability of the Bonzel and Yock patents, (b) to abandon imminent interference proceedings before the United States Patent and Trademark Office, and (c) to refrain from challenging the issuance of further patents.· Second, Schneider and ACS engaged in a concerted refusal to deal with potential licensees of their ·patents. Third, Schneider and ACS pursued "sham litigation" seeking to enforce patents which were known by them to be invalid and unenforceable.[28]

#### a. *Settlement and cross-licensing agreement*

■ It is well-established that settlement of patent litigation through a cross-licensing agreement does not in and of itself violate the antitrust laws. *See, e.g., Standard Oil Co. v. United States*, 283 U.S. 163, 170, 51 S.Ct. 421, 423–24, 75 L.Ed. 926 (1930); *Duplan Corp. v. Deering Milliken, Inc.*, 540 F.2d 1215, 1220 (4th Cir.1976); *Philip Morris, Inc. v. Brown & Williamson Tobacco Corp.*, 641 F.Supp. 1438, 1491 (M.D.Ga.1986). The cross-licensing cases cited by BSC and SciMed involved additional agreements having clear anti-competitive effects but no legitimate business justification. *See, e.g., Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395

---

**28.** In addition, a substantial portion of the complaint is devoted to a recitation of Schneider's alleged misconduct before the PTO and the Minnesota court. (First Am. Compl. at 19–26.)

As I held above, however, both SciMed and BSC are precluded from litigating those issues here. *See supra* part V.

U.S. 100, 114–15, 89 S.Ct. 1562, 1571–72, 23 L.Ed.2d 129 (1969) (citing *International Salt Co. v. United States,* 332 U.S. 392, 395–96, 68 S.Ct. 12, 14–15, 92 L.Ed. 20 (1947)) (tying arrangement); *United States v. Singer Mfg. Co.,* 374 U.S. 174, 179–88, 83 S.Ct. 1773, 1776–81, 10 L.Ed.2d 823 (1963) (written expressions of intention to use cross-licensing to exclude Japanese competitors); *AG Fur Industrielle Elektronik Agie v. Sodick Co.,* No. 87 C 8974, 1990 WL 174921, at *2–4 (N.D.Ill. Oct.22, 1990) (same); *United States v. Krasnov,* 143 F.Supp. 184, 199 (E.D.Pa. 1956) (price-fixing arrangement), *aff'd,* 355 U.S. 5, 78 S.Ct. 34, 2 L.Ed.2d 21 (1957); *United States v. General Instrument Corp.,* 87 F.Supp. 157, 190–94 (D.N.J.1949) (same).

Moreover, these cases lacked the "legitimately conflicting claims or threatened interferences" which are required to justify the settlements themselves. *Standard Oil,* 283 U.S. at 170, 51 S.Ct. at 423–24. In other words, because the lawsuit threatened the validity of patents held by only one of the parties, the other party did not have an adequate reason for settling. For example, the court in *Duplan Corp. v. Deering Milliken Inc.,* 444 F.Supp. 648, 686 (D.S.C.1977), *aff'd in part, rev'd in part on other grounds,* 594 F.2d 979 (4th Cir.1979), *cert. denied,* 444 U.S. 1015, 100 S.Ct. 666, 62 L.Ed.2d 645 (1980), stated: "Assuming the validity of the reasons advanced for Leesona's interest in settlement, the reasons afforded an additional cause for DMRC and Chavanoz not to settle.... DMRC and Chavanoz entered into the Whitin litigation confidently expecting to win it and inflict 'total disaster' on Leesona." *Id.* at 687. Therefore, DMRC and Chavanoz did not have a legitimate reason, such as a need to protect their own patents, for settling the case. *See also AG Fur Industrielle,* 1990 WL 174921, at *2 (agreement entered after one party threatened to attack validity of vulnerable patent held by the other).

Similarly, in *United States v. Singer Manufacturing Co.,* 374 U.S. 174, 195, 83 S.Ct. 1773, 1784, 10 L.Ed.2d 823 (1963), *neither* party entered into the agreement with a legitimate business purpose. As to one party, Singer, the Court stated: "Singer cannot, of course, contend that it sought the assignment of the patent merely to assure that it could produce and sell its machines, since the preceding cross-license agreement had assured that right." *Id.* at 195, 83 S.Ct. at 1784. As to the other party, Gegauf, "th[e] purpose to exclude the Japanese was the only one disclosed to Gegauf, and in fact the very one used to convince Gegauf of the advisability of entering into an agreement." *Id.* at 190, 83 S.Ct. at 1782.

Here, the complaint essentially rests upon the settlement and cross-licensing agreement themselves. That is, the complaint does not allege the type of additional arrangements— e.g., tying, price-fixing, or written understandings of exclusionary purpose—that ordinarily are required for antitrust liability.[29] Nevertheless, the complaint does assert that the settlement had an anti-competitive effect and no legitimate business purpose. As a result, I turn to the issue of whether those allegations are legally sufficient, despite the general rule of *Standard Oil,* to survive a motion to dismiss.

Paragraph 8 of the complaint summarizes its theory regarding the illegality of the settlement and cross-licensing agreement:

Defendants entered into a written agreement, and reached certain joint understandings in connection therewith, in which they set aside their individual competitive self-interests, agreeing instead to abandon then pending litigations and an imminent interference proceeding in the Patent Office. In entering into their agreement, Defendants recognized that regardless of how those proceedings were resolved, neither party could exclude other competitors or obtain a monopoly as long as Defendants acted independently, but that they could obtain a shared monopoly by ceasing to act independently, combining their respective overlapping patent positions, and creating a joint patent position greater than the sum of the patent positions either Defendant could have obtained on its own.

---

**29.** As I explain below, the allegations of sham litigation and refusal to deal fail to stand apart from the claim that the settlement and cross-licensing agreement are themselves illegal.

Thus, the alleged anti-competitive effect of the agreement was the maintenance and issuance of overly broad patents, which themselves are legal monopolies. However, the theory assumes a failure on the part of the Patent and Trademark Office to limit the patents to their proper scope: "The parties knew that the Patent Office would not in the circumstances detect the duplicative nature of the Bonzel and Yock claims." (First Am. Compl. ¶ 34A.) In this regard, I note Judge Jensen's finding that "the PTO clearly was aware of the similarities between the Yock and Bonzel patents." *Advanced Cardiovascular Sys., Inc. v. Medtronic, Inc.*, No. C–95–3577 DLJ, 1996 WL 467293, at *8 n. 6 (N.D.Cal. July 24, 1996). Of course, I do not purport to resolve factual questions on a motion to dismiss. Nevertheless, I do find that anti-competitive effects cannot be adequately alleged when they require a presumption that the PTO is unable to do its job without the assistance of outside parties.

The complaint also alleges that the settlement and cross-licensing agreement had no legitimate business purpose. According to the complaint, Schneider and ACS "set aside their individual competitive self-interests," (First Am. Compl. ¶ 8), and they would not have entered into the agreement "[b]ut for the prospect of monopoly," (*id.* ¶ 42C). Other allegations of the same complaint, however, demonstrate that this case is much different from those, cited above, in which one or both parties did not act to protect their own patent interests. For example, paragraph 30 states that "each side had challenged the scope, validity and enforceability of the other's patents." Specifically, paragraphs 31 and 32 detail what Schneider and ACS had to lose, respectively, from continued litigation or interference proceedings. Therefore, even if there had been no prospect for "creating a joint patent position greater than the sum of the patent positions either Defendant could have obtained on its own," (First Am. Compl. ¶ 8), each party would have had a legitimate reason to settle—i.e., to protect its own patent interests.

In sum, the allegations themselves demonstrate a legitimate business purpose behind the settlement and cross-licensing agree-ment, and the alleged anti-competitive effects thereof are primarily based upon untenable suppositions concerning what the PTO would have done with assistance from private parties. Indeed, this case provides support for the general rule that settlements and cross-licensing agreements do not, without something more, violate the antitrust laws. As a result, I turn to the other allegations of the complaint to determine whether they sufficiently allege that Schneider and ACS have used a valid settlement and cross-licensing agreement in an impermissibly anti-competitive fashion.

#### b. *Refusal to deal*

It is certainly true that "a concerted refusal to license patents is no less unlawful than other concerted refusals to deal." *SCM Corp. v. Xerox Corp.*, 645 F.2d 1195, 1204 (2d Cir.1981). However, the complaint is careful not to allege that either party actually agreed to refrain from licensing *its own patent* to third parties without the consent of the other. *Cf. Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 114–15, 89 S.Ct. 1562, 1571–72, 23 L.Ed.2d 129 (1969) (discussing patent pool where individual patentees could not license their own patents). Instead, the cross-licensing agreement merely provided that neither party would sublicense the *other party's patent.* In other words, each party retained the power only to control the licensing of its own patent, a power which lies at "[t]he heart of [the patentee's] legal monopoly." *Zenith*, 395 U.S. at 135, 89 S.Ct. at 1583.

The complaint is based on the theory that the Bonzel and Yock patents overlap, and that therefore no third party can enter the rapid exchange catheter market without obtaining a license from both patentees. As a result, no third party would want just one license, and each party is effectively precluded from licensing *its own patent* unless the other party agrees to the licensing of *its* patent as well. The flaw in this theory, however, is that it is based entirely on the alleged overlapping nature of the patents, rather than on any joint action by Schneider and ACS. The same problem—i.e., "that potential competitors must approach both Schneider and ACS in order to obtain licens-

es under the Bonzel patent and the Yock patents," (First Am. Compl. ¶ 42B)—would exist if Schneider and ACS held overlapping patents but never had any contact whatsoever.[30] In effect, therefore, the complaint might successfully allege a refusal to deal in concert, but not a concerted refusal to deal.

### c. Sham litigation

■ Under the *Noerr–Pennington* doctrine, one who files a lawsuit or otherwise petitions the government for redress is generally immune from antitrust liability unless such litigation or activity is a "sham." *See Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.,* 508 U.S. 49, 56–60, 113 S.Ct. 1920, 1925–28, 123 L.Ed.2d 611 (1993) (discussing *Eastern R.R. Presidents Conf. v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), and *United Mine Workers of Am. v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965)).

The Supreme Court has outlined a two-tiered inquiry to establish when the "sham litigation" exception applies. "First, the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits." *Id.* at 60, 113 S.Ct. at 1928. Second, the lawsuit must "conceal[ ] an attempt to interfere directly with the business relationships of a competitor ... through the use of the governmental process—as opposed to the outcome of that process—as an anticompetitive weapon." *Id.* at 60–61, 113 S.Ct. at 1928 (internal quotations omitted). The second, subjective tier of this inquiry is reached only if the court finds that the objective baselessness requirement of the first tier is met. *See id.* at 60, 113 S.Ct. at 1928.

In the complaint, BSC and SciMed identify three separate cases as sham litigation: (1) the *SciMed* action, *see supra* subsection III.B.3, (2) the counterclaims asserted by Schneider in the patent case before me, and (3) the action brought by ACS against SciMed in the Northern District of California

on October 10, 1995, *see supra* subsection III.B.6. (First Am. Compl. ¶ 40.) I address each of these cases in turn.

Because "a[ ] winning lawsuit is by definition a reasonable effort at petitioning for redress and therefore not a sham," *Professional Real Estate,* 508 U.S. at 61 n. 5, 113 S.Ct. at 1928 n. 5, the complaint alleges that SciMed "was a sham litigation to the extent it is proved that Schneider committed fraud on the court." However, SciMed has failed to prove such fraud here, *see supra* pp. 256–57 n. 14, and thus the *SciMed* action was not sham litigation.

The allegation that Schneider's counterclaims in the patent action are a sham fail for three independent reasons. First, *BSC* initiated the patent action. *Cf. Professional Real Estate,* 508 U.S. at 58, 113 S.Ct. at 1926–27 (referring to "the institution of legal proceedings"). It is highly ironic that BSC sued Schneider for a declaratory judgment of non-infringement and now attempts to characterize as a sham Schneider's counterclaims for infringement, which were *compulsory* under Fed.R.Civ.P. 13(a). Second, the allegation is based upon the purported invalidity and unenforceability of the Bonzel patent, issues which both SciMed and BSC are estopped from raising. *See supra* part V. Third, after ruling on the non-infringement issue, I find that the counterclaims, though unsuccessful, clearly had merit.

Finally, the complaint refers to the assertion by ACS of the Yock 3 and Yock 4 patents in pending litigation in the Northern District of California. The complaint fails to mention that the case is also based upon the Yock 1 and Yock 2 patents. Of course, BSC and SciMed can hardly claim that the assertion of the 1 and 2 patents is a sham, because each party has agreed to pay substantial sums to ACS in settlement of alleged infringement of those patents, and BSC has conceded that the patents are "not invalid [and] are enforceable." *See supra* subsections III.B.2, III.B.4. I doubt that the sham

---

**30.** Of course, the complaint states that the alleged overlapping nature of the Bonzel and Yock patents is a direct result of the settlement between Schneider and ACS. (First Am. Compl. ¶ 42B.) This merely repeats the complaint's central allegation—i.e., that it was illegal for the parties to withdraw their opposition to the respective patents. I address that issue in subsection VIII.A.2.a., *supra.*

litigation exception to the *Noerr–Pennington* doctrine applies to independent claims as opposed to an entire suit. *Cf. Professional Real Estate*, 508 U.S. at 60, 113 S.Ct. at 1928 ("[T]he lawsuit must be objectively baseless."); *id.* at 58, 113 S.Ct. at 1926–27 (referring to "the institution of legal proceedings").

In any event, the complaint states that the assertion of the 3 and 4 patents "is objectively baseless because the patents ... were and are known not to be genuine but to have issued only because of Defendants' illegal Agreement and understandings." (First Am. Compl. ¶ 40.)[31] Thus, the only potentially viable claim of sham litigation depends upon the sufficiency of the complaint's primary allegation—i.e., that the cross-licensing agreement between Schneider and ACS is illegal. I have found in subsection VII.A.2.a., *supra*, of course, that the complaint fails to state a claim on those grounds. Because I find that BSC and SciMed would not be entitled to relief even if they were to prove all of the well-pleaded facts found in the complaint,[32] I will grant the motions of Schneider and ACS to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(6).

### B. *State Claims*

Having dismissed the federal claims, I decline to exercise supplemental jurisdiction and dismiss the state claims as well under 28 U.S.C. § 1367(c)(3).

### IX. *Conclusion*

For the reasons set forth more fully above,

(1) In Civil Action No. 94–10967–DPW: Schneider's motion for partial summary judgment that BSC not be allowed to relitigate the issue of validity is GRANTED; Schneider's motion for partial summary judgment that BSC not be allowed to relitigate the issue of inequitable conduct is GRANTED; Schneider's motion for partial summary judgment that SciMed's second affirmative defense of unenforceability be dismissed with prejudice is GRANTED; BSC's motion for summary judgment (which is necessarily applicable to SciMed) establishing non-infringement is GRANTED; and

(2) In Civil Action No. 95–12715–DPW: the motions of Schneider and ACS to dismiss are GRANTED.

The clerk is directed to enter, in accordance with this memorandum, judgment in Civil Action No. 94–10967–DPW for defendant Schneider in the case-in-chief and for defendants-in-counterclaim, BSC and SciMed, on the counterclaim; and judgment for defendants Schneider and ACS in Civil Action No. 95–12715–DPW.

---

**31.** I note that SciMed's second affirmative defense in the California litigation has been dismissed with prejudice for failure to state a cognizable claim of patent misuse. *Advanced Cardiovascular Sys., Inc. v. Medtronic, Inc.*, No. C–95–3577 DLJ, 1996 WL 467293, at *3–5 (N.D.Cal. July 24, 1996). The court stated that "the crux of this defense is that ACS knew the patent was invalid or unenforceable at the time it filed this action." *Id.* at 7. In the very litigation claimed to be a sham, therefore, the judge has dismissed a defense which requires proof of the same facts now asserted as the basis for the allegation of sham.

**32.** I note that I already have granted BSC and SciMed one opportunity to amend their complaint in order to survive the motion to dismiss. The First Amended Complaint, while stating facts with greater particularity than the original complaint, fails to state a claim on which relief can be granted. The problem for BSC and SciMed is that their version of events, even if true, does not amount to a violation of the antitrust laws.